**AFFIRM and Opinion Filed June 17, 2014.**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

### No. 05-14-00037-CV

### IN THE INTEREST OF J.D.B., A CHILD,

**On Appeal from the 304th Judicial District Court**
**Dallas County, Texas**
**Trial Court Cause No. 12-771-W**

## OPINION

Before Justices O'Neill, Myers, and Brown
Opinion by Justice Brown

Mother and Father appeal the trial court's judgment rendered on a jury verdict terminating their parental rights to their son, J.D.B. In three issues, they contend the evidence is legally and factually insufficient to support the jury's findings that they committed acts justifying termination and that termination of their parental rights was in J.D.B.'s best interest. We affirm.

### Background

J.D.B. was born on May 31, 2012 in Florida. On June 22, 2012, when J.D.B. was a little more than three weeks old, Mother and Father took him to the emergency room after Mother noticed that his shoulder was swollen. The hospital personnel took a "Babygram" or infant x-ray of J.D.B.'s chest, abdomen, and pelvis and performed an ultrasound on the area and found no injuries. According to Mother, the hospital told them J.D.B. was fine and the swelling could have been from spit-up or J.D.B.'s sleep position. One week later, Mother and Father took J.D.B. for his four-week wellness check-up with his pediatrician during which Mother expressed

her concerns to the pediatrician about J.D.B.'s swollen shoulder. Mother said the pediatrician reassured her and completed the wellness exam, noting that the "patient complained of shoulder pain."

In early July, Mother and Father moved to Texas. They left Florida on July 9, 2012 and drove for two-days, stopping overnight in Louisiana. They arrived in Texas around three o'clock in the afternoon on July 10, 2012. Upon arrival, they undressed J.D.B. so he could cool down and noticed that his arm was swollen and that he was "not really moving it." J.D.B. was not crying and did not seem like he was upset. After consulting with Mother's step-dad, Brannon,[1] they decided to take J.D.B. to the emergency room at Baylor Medical Center in Garland, Texas.

The professionals at Baylor noted there was "no obvious bruising" and that J.D.B. did not appear to be in distress. But they indicated his pain level was an eight out of ten and noted that there was an "obvious deformity" with his left upper arm. After taking an x-ray, the professionals confirmed J.D.B. had a broken arm and multiple other fractures in different stages of healing. Mother and Father told the professionals that they did not know how the fractures occurred or notice any swelling until that day. Due to J.D.B.'s fractures, a social worker referred the case to the Child Protective Services (CPS) unit of the Texas Department of Family and Protective Services (the Department), and J.D.B. was transferred to Children's Medical Center in Dallas for further evaluation.

During his initial admission at Children's, J.D.B. was examined by multiple physicians from various disciplines, including radiologists, a surgeon from the trauma service, and an orthopedic surgeon. He also was examined by pediatricians in the REACH clinic.[2] The REACH

---

[1] To protect the privacy of the parties, we identify the child's relatives by their first names only. *See* TEX. FAM. CODE ANN. § 109.002(d) (West 2014); TEX. R. APP. P. 9.8.

[2] REACH stands for Referral and Evaluation of Abused Children. REACH evaluates any child with concerns or suspicions of child abuse and neglect.

physicians that examined J.D.B. were Drs. Cathleen Lang and Matthew Cox, both of whom testified at trial. Lang further reviewed J.D.B.'s medical records from Florida.

The next day, J.D.B. underwent a skeletal survey that revealed the following injuries: an acute fracture to the left humerus, a healing fracture to the left clavicle, healing fractures to four posterior ribs, a healing spiral fracture of the mid and distal right femur, bucket-handle type fractures (end of bone, corner fracture) of the distal right femoral metaphysis and proximal and distal tibial metaphyses, fractures at the bases of four metatarsals (bones in the foot), fractures at the heads of two left metatarsals, healing bucket-handle type fractures of the proximal left tibial metaphysis and distal metaphysis of the left radius, a healing corner fracture of the distal left femoral metaphysis, and a possible non-displaced fracture at the base of the left small finger. J.D.B.'s head scan was normal. He had no bruising. But according to Lang, a lack of bruising is not unusual and "would actually be expected" because you "really don't see bruising with fractures."

Lang testified that with the amount of fractures sustained by J.D.B., the physicians wanted to make sure they were not "missing something" so they ordered multiple tests to determine whether J.D.B. had a bone disorder. Lang also consulted with an endocrinologist and a radiologist, who was an expert in bone diseases. The medical records indicate the physicians sought to "[r]ule out non-accidental trauma" as the cause of J.D.B.'s injuries. Mother and Father reported no family history of bone disease, and specifically, neither parent had known multiple fractures. They did state, however, that Mother's grandmother and Father's grandfather had "weak bones" but no formal diagnosis for those relatives was given.

Lang said J.D.B.'s radiographic findings did not suggest an underlying bone disease. Lang explained that J.D.B.'s bones looked normal on the x-ray and because of this, the physicians directed their treatment toward testing for "the diseases that could have normal bones

on x-rays but still have fragility to them." One bone disorder for which they ran specific tests was osteogenesis imperfecta, a bone disease present in a child's DNA that can cause brittle bones and infant fractures. They also tested J.D.B.'s Vitamin D levels to rule out rickets. Lang said the "most classic form" of rickets is a Vitamin D deficiency, and explained "that can cause decreased mineralization of the bones because of alterations in your calcium and your phosphor[u]s." As part of J.D.B.'s extensive blood testing, the physicians tested for "all the electrolytes, including calcium, magnesium, and phosphor[u]s because of the electrolytes in the bone." J.D.B. had normal calcium and phosphorus levels, but his parathyroid hormone, which regulates a person's calcium and phosphorus, was slightly elevated. According to Lang, most bone disorders with an elevated parathyroid hormone would also have deviations in calcium and phosphorus levels.

In addition to the multiple new and healing fractures, J.D.B. had healing linear scratches to his chin and a torn frenulum. Specifically, Lang observed that the frenulum underneath J.D.B.'s tongue had been "ripped open" and was in stages of healing. Lang testified that the frenulum injury is "indicative of something happening to the child" because a 41-day old infant like J.D.B. would not be able to self-inflict this injury; it means that someone had to forcefully shove something into his mouth to cause the injury. She was less concerned about the scratches to J.D.B.'s chin, but in her affidavit attached to the petition for protection of J.D.B., she stated that the abrasions on his face are "deeper than would be expected from self-inflicted scratching." Cox agreed the scratches were "deeper injuries" and not consistent with a baby scratching his face with his fingernails.

While at Children's, Mother and Father met with a social worker and Lang during which Mother told them she was shocked when she found out J.D.B. had a broken arm because he was not fussy and did not seem to be in pain. The parents had no explanation for what may have

caused J.D.B.'s fractures. Mother also told them that she and Father were J.D.B.'s primary caregivers and that no one else had cared for him. Mother and Father said J.D.B. "scratches his face and also scratched the inside of his mouth a few weeks ago." According to Mother, she showed the scratch inside J.D.B.'s mouth to his Florida pediatrician, and they subsequently trimmed his nails.

Based on the severity of his injuries and his age and because CPS believed J.D.B. would be at serious risk for further harm if he remained with his parents, CPS removed J.D.B. from his parents' care. When J.D.B. was discharged from Children's on July 12, 2012, CPS took him into custody and placed him with a foster family. The Department then filed its original petition for protection of J.D.B. for conservatorship and for termination of Mother's and Father's parental rights. J.D.B. was subsequently placed with Mother's step-grandfather, Duane, and Mother and Father were permitted to have supervised visits with J.D.B.

At the time the Department filed its petition, the results for J.D.B.'s testing for osteogenesis imperfecta and Vitamin D were pending, but there no physical findings on his exams to suggest a genetic bone disorder. In her affidavit, Lang noted that there was no history of trauma to explain J.D.B.'s injuries, and she said that although J.D.B. was being tested for bone disorders, "his injuries are extensive and highly concerning for repeated inflicted injury." She added that his other injuries, like the frenulum tear, are not explained by a bone disorder. Lang testified that another test to rule out a medical explanation for the fractures is to remove the child from the environment to see if the child sustains new fractures. That is, if the child had a bone disease, the child would still continue to get fractures. But "if you remove the child and you don't get any additional fractures, that's your guideline right there. The cause is the environment." It shows that "whatever was happening, happened in the home."

J.D.B. had a second skeletal survey on August 1, 2012. Lang explained the purpose of repeating the skeletal survey is to make sure everything is healing properly and to identify any additional fractures that were not previously seen. Lang testified that some types of fractures are not seen in an x-ray until the healing process begins. She said that a fracture starts healing in ten to fourteen days at which time the healing is noticed by a callus formation or periosteal reaction showing the callus formation. Lang testified that after the second skeletal survey, the physicians found additional old fractures that were identified because of the healing but "no new fractures." The skeletal survey was repeated again in October 2012. Lang testified that the October skeletal survey showed that J.D.B. was still in phases of healing, but there were no new fractures; "[e]verything had already been previously identified and was continuing to heal."

The results of J.D.B.'s Vitamin D tests showed that his Vitamin D level was on the low end of the normal range. According to Lang, forty percent of patients have a Vitamin D level in that range. And even when a child has low Vitamin D, she would not expect to see fractures in a child J.D.B.'s age. Lang testified that the only other findings on J.D.B.'s lab results were consistent with abundant healing. For example, J.D.B.'s elevated alkaline phosphatase was a "marker of healing" and his mild elevation in his parathyroid hormone "also is something that is seen in the healing process." J.D.B.'s endocrinologist similarly noted that the elevated findings "could be due to the fractures themselves." The elevated findings normalized in follow-up testing.

The results of the genetic testing for metabolic bone disorder were negative, and Lang concluded that based on the negative results, J.D.B. did not have a bone disorder or rickets. Lang specifically testified that J.D.B.'s Vitamin D level was "not at a level that could cause Rickets." Further, the various tests performed to check for forms of osteogenesis imperfecta were negative. Cox agreed with Lang's assessment; he did not identify any underlying bone

disease process to explain J.D.B.'s multiple injuries.  He also agreed that J.D.B. did not have rickets.

From the skeletal surveys, the physicians identified a total of twenty-six fractures that were of different types.  J.D.B. had a spiral fracture in his thigh bone, which is caused by a twisting type of mechanism.  The fracture in his arm was a displaced fracture, which meant that the bone was in two separate pieces.  Lang said J.D.B.'s arm fracture would "probably be painful" and he would be in "obvious pain" any time the arm is moved.  J.D.B. also had bucket-handle fractures, which are caused when something forcefully pulls the un-calcified portion of the end of the bone away and a chip of the calcified portion goes with it.  The little bones in J.D.B.'s foot also had "little chips coming off the top."  Lang testified that it takes a "considerable amount of force" to break a bone in a baby because a baby's bones are more elastic and can take stress better than adults.  She explained that "it's not something that's going to happen in normal, daily activity such as changing diapers or something like that.  It's something that, when it's done, you know that it's done, and the child is in pain."

Lang also testified that they ruled out the medical possibilities for the fractures and the fact that J.D.B. stopped getting fractures after he was removed from the home was "consistent with a diagnosis of abusive trauma."  In describing the number and type of fractures, Lang said J.D.B.'s injuries fall on the "severe end of abuse."  According to Cox, Mother and Father did not believe the injuries were inflicted, rather they felt there was an underlying disease process.  But Cox testified that J.D.B. had a "very comprehensive assessment" to look for an underlying disease and he cannot think of another test to identify a potential cause.  He added that time is part of the diagnosis; J.D.B. has not had any more injuries since he was six weeks old.

As part of the trial court's temporary orders, Mother and Father were required to, among other things, participate in parenting classes and attend counseling.  For the court-ordered

counseling, Mother and Father were referred to Matilda Frederick, a therapist, who testified to her counseling sessions with Mother and Father. Frederick met with them as a couple and individually. Frederick said generally that the parents attended the sessions, had good attitudes, participated, and completed the services. But Frederick had concerns. One of Frederick's biggest concerns was Mother's lack of empathy. Frederick testified that Mother said she did not harm her child, but Frederick never observed Mother sobbing or crying when they discussed J.D.B.'s injuries. Rather, Mother offered "more of an explanation of what the injuries were about," and Mother would not consider any explanation other than a bone disease. Frederick testified that neither parent had an explanation for why J.D.B. had no injuries after leaving their care other than telling her J.D.B. was "recovering from brittle bone disease." Mother also denied having any life problems other than being involved in a CPS case. Because Mother denied having any problems, Frederick could not measure the success of the counseling and did not think she made any therapeutic progress with Mother. Frederick had the same concerns with Father. Although Father similarly denied having any issues, Frederick said they made progress with respect to Father's employment search. Frederick admitted that CPS wanted her to focus on the fact that the parents were denying any type of physical abuse. And she agreed that if the parents believed the child had a bone disorder that they would not have admitted to any physical abuse.

Darlene Carpenter, the CPS caseworker, testified that from the beginning, the parents denied harming their child and sought a medical reason for J.D.B.'s injuries. So when the parents asked for more testing, J.D.B. received more testing. Carpenter said that when a parent denies harming the child, Carpenter goes to the medical experts to determine whether there is a plausible medical explanation for the injuries. Carpenter worked closely with Lang and other physicians at Children's and testified that no medical professional has told her there was a

medical explanation for J.D.B.'s injuries. Based on the information she reviewed, Carpenter said CPS's recommendation in this case is for termination of Mother's and Father's parental rights and to continue J.D.B.'s placement with Duane. She also said CPS would consent to J.D.B.'s adoption by Duane, who testified that he would adopt J.D.B. if he were available for adoption.

Duane became involved in this case after the first court hearing in July 2012. And since August 28, 2012 (when J.D.B. was placed in Duane's care), J.D.B. has not received any new fractures. Duane testified that it would not be in J.D.B.'s best interest to return J.D.B. to his parents because they appear to lack the normal instincts in caring for a child and "put other events and circumstances ahead of the interest of their own child." He also said they "seemed to struggle at times, even after doing the parenting classes." He came to this conclusion after observing the parents' visits with J.D.B. and considering the injuries J.D.B. sustained before being removed from their care. Duane also testified that Mother has told him that if she and Father regain custody of J.D.B., she will file for sole custody because she is no longer with Father. Duane said Mother further explained that she has concerns for J.D.B.'s safety and well-being due to Father's "anger issues." Duane said, however, that Mother defends Father's actions and seems protective of Father. Although Duane has talked to J.D.B.'s physicians about his injuries, he has not talked about the injuries with Mother and Father because "they are for sure it was bone disease." Duane testified that J.D.B. is not on any special medications and is growing and healthy.

Dr. Charles Hyman testified as an expert for Mother and Father. Hyman testified that J.D.B. was not a victim of child abuse; rather, Hyman concluded that "there are medical explanations for [J.D.B.'s] fractures." Specifically, Hyman said J.D.B. has a bone fragility disorder, which means that fractures can occur with minimal force and "regardless of how the x-rays look or even more quantitative tests." Hyman also said that based on the x-ray and

laboratory evidence, J.D.B. definitely had rickets, which he described as the less than ideal mineralization of the growth plate and a contributing force to bone fragility. Hyman concluded that rickets caused a percentage of J.D.B.'s fractures. And based on the "plain as day" laboratory results that he says supports a diagnosis of rickets, Hyman believed that the physicians at Children's who did not diagnose J.D.B. as having rickets are wrong.

Hyman explained that genetics affects a person's bone strength. And when you consider suspicious fractures, the physician should check to see if the fracture is through a normal bone. Hyman testified that cellular metabolism affects bone failure, and he highlighted various factors from J.D.B.'s medical records that "could have had a negative impact on his cellular biology, which could have adversely impacted his bone quality and strength and put him at risk for bone fragility." Those factors included Mother's late prenatal care, her poor diet and high body mass index, Mother's exposure to secondhand smoke, gestational hypertension, maternal anxiety disorder, and her regular use of TUMS during pregnancy. In addition, J.D.B. was partially breastfed (which affects Vitamin D levels because there is less Vitamin D in breast milk than in formula) and exposed to secondhand smoke.

Hyman also explained the radiological findings that supported his conclusion. For example, Hyman said J.D.B. did not have uniform bone density; rather, his bones had a moth-eaten appearance. In addition, Hyman said some of the fractures identified by the Children's physicians as bucket-handle or corner fractures were actually growth plate fractures, which are found in children with metabolic bone problems. He testified that the alternating dense and lucent lines on J.D.B.'s x-rays show a healing metabolic problem that are part of the normal anatomy. Hyman also said the images of J.D.B.'s femurs are "classic views of healing Rickets" because of the cupping of the bone and dots of mineralization. He testified that other x-rays, like J.D.B.'s July x-ray of his ankle, shows a mineralization problem, not a fracture.

The fact that J.D.B.'s fractures were silent fractures, meaning no one knew he had fractures, also was relevant to Hyman's diagnosis. Hyman testified that clinically silent fractures are seen with increased frequency in those with bone fragility disorders. And he said that while it is possible to have fractures without bruises, Hyman testified that as the number of fractures increases, "it becomes unheard of to not have any other type of cutaneous injury." According to Hyman, J.D.B. was "unscathed" and did not look "sick or traumatized" when he presented. But Hyman did not examine J.D.B.; he only reviewed the medical records provided to him by Mother and Father.

Hyman acknowledged that the types of problems he testified to show up in only 2.5 percent of the population, and he agreed that statistically, "it's not the most common presentation," making the parents of a baby like J.D.B. "very unlucky" parents. He also agreed that if a baby is placed in foster care and does not receive any additional fractures, then the lack of fractures after removal "could be" indicative of child abuse. But he claims it also could be changes in cellular biology, which could change a child's situation. He added that J.D.B.'s x-rays show changes of his increased mineralization. Hyman said he does not know whether J.D.B. will suffer more fractures because J.D.B. still could have an underlying metabolic bone disease. He also said that a torn frenulum is not necessarily a sign of child abuse.

Mother testified she was very confused when she was told that J.D.B. had multiple fractures. She told CPS that she did not know "what could have caused all of these injuries" and that J.D.B. had seen other doctors in Florida who said he was fine. Mother said that when Lang discussed the diagnosis of non-accidental trauma with her, Mother concluded that diagnosis was wrong because she knew that neither she nor Father or anyone else in their family had hurt their son. Mother explained she was around J.D.B. except for one hour of his life and she knew "exactly what was going on" and "how he was handled." Mother testified that Father is a "great

dad" and she did not have any concerns with how Father held or treated J.D.B. She also said she would be able to tell if Father was the one who was harming J.D.B. because J.D.B. would be screaming or yelling. Nobody in their family expressed any concerns about their handling of J.D.B. or his health at any time before they moved to Texas.

Mother said that J.D.B.'s torn frenulum was just a surface cut that happened when she tried to force J.D.B. to stay on her nipple as instructed by the breastfeeding experts. She explained she used a nipple shield because she had difficulty breastfeeding. She noticed blood on the nipple shield and thought J.D.B. "could have scratched the inside of his mouth" or the scratch could have come from "nipple shield itself, between him rocking his head back and forth and the forcefulness [she] had to use." Both Lang and Cox disagreed that a nipple shield would cause the frenulum injury because the shields are soft, flexible pieces of plastic.

Because she knew there was "no way" J.D.B.'s injuries could have been non-accidental trauma, Mother researched different things online and contacted doctors to "figure out what it was." Mother agreed that she asked for J.D.B. to be retested for various forms of osteogenesis imperfecta and the tests ruled out that diagnosis. She also agreed that in October 2012, she told Carpenter that she thought J.D.B. had temporary brittle bone disease, which Mother discovered through her research. Mother further agreed that in March of 2013, she thought J.D.B. had metabolic bone disease. And now she believes that based on Hyman's testimony, J.D.B. has healing rickets and her mind is not open to any other possibility.

Mother testified that they completed the parenting classes as ordered by the court. And although she completed the required counseling, she complained that there was not much counseling going on because Frederick would spend their time talking about irrelevant things. Mother also felt like Frederick directed a lot of hateful energy to Mother and would accuse her of hurting J.D.B. Mother believes J.D.B. was wrongfully removed and that CPS concluded J.D.B.

–12–

was abused early on in the case. She explained that in the beginning, the plan was for J.D.B. to be returned to them, but before that could happen, CPS wanted the parents to either accept responsibility for J.D.B.'s injuries or offer a plausible explanation for his injuries. Mother testified that even though she found Hyman and Hyman provided a reason for J.D.B.'s injuries, it was "not good enough" for CPS. Mother believes Hyman's diagnosis is accurate.

Father similarly testified that he is not open to the possibility that somebody intentionally hurt J.D.B. He said that he knew Mother did not hurt their son. He also denied having any anger issues or problems requiring counseling. Father disagrees with the diagnosis of child abuse and testified that after hearing all the physicians testify, he's "with Dr. Hyman" because Hyman's testimony is "all that makes sense to [him]."

After hearing all the testimony, the jury found that both Mother and Father had allowed J.D.B. to remain in an endangering environment and had engaged in conduct that endangered J.D.B.'s physical or emotional well-being. *See* TEX. FAM. CODE ANN. § 161.001(1)(D), (E) (West 2014). The jury also found that it was in J.D.B.'s best interest for Mother's and Father's parental rights to be terminated and conservatorship to be granted to the Department for the purpose of placing J.D.B. with a relative or other suitable person. *Id.* § 161.001(2). On December 20, 2013, the trial court signed a final judgment adopting the jury's findings and terminating Mother's and Father's parental rights to J.D.B. Mother and Father filed a motion for new trial, which the trial court denied. This appeal followed.[3] In three issues, Mother and Father

---

[3] We note that at the hearing on the motion for new trial, counsel for Mother and Father informed the trial court that Father had passed away. Generally, the death of a party can render an appeal by the party moot unless the judgment affects the party's property rights as opposed to purely personal rights. *Olson v. Comm'n for Lawyer Discipline*, 901 S.W.2d 520, 522–23 (Tex. App.—El Paso 1995, no writ). In this appeal, the judgment does affect property rights because if we determine that the termination decree should be reversed, the parent-child relationship between Father and J.D.B. would be restored, and J.D.B. would potentially be entitled to a share of Father's estate. *In re S.N.*, 272 S.W.3d 45, 57 (Tex. App.—Waco 2008, no pet.) (op. on reh'g). In addition, although an order terminating the parent-child relationship divests the parent and the child of all legal rights and duties with respect to each other, "the child retains the right to inherit from and through the parent unless the court otherwise provides." TEX. FAM. CODE ANN. § 161.206(b). Here, the trial court's judgment terminating Father's parental rights does not contain provisions that would affect the child's right to inherit from Father.

challenge the legal and factual sufficiency of the evidence supporting the judgment terminating each of their parental rights.

## Standard of Review

Because termination of parental rights is "complete, final, irrevocable and divests for all time" the natural right existing between parents and their children, the evidence in support of termination must be clear and convincing "before a court may involuntarily terminate a parent's rights." *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985) (citing *Santosky v. Kramer*, 455 U.S. 745, 747–48 (1982)); *In re A.B.*, No. 13-0749, 2014 WL 1998440, at *3 (Tex. May 16, 2014). "Clear and convincing evidence" is "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." TEX. FAM. CODE ANN. § 101.007 (West 2014).

On appeal, we apply a standard of review that reflects the elevated burden at trial. *In re A.B.*, 2014 WL 1998440, at *3; *In re A.T.*, 406 S.W.3d 365, 370 (Tex. App.—Dallas 2013, pet. denied). This means both legal and factual sufficiency review of a decree terminating parental rights require a reviewing court to consider all the evidence to determine whether the fact-finder could reasonably form a firm belief or conviction that the grounds for termination are proven. *See In re J.F.C.*, 96 S.W.3d 256, 265–66 (Tex. 2002). In evaluating the evidence for legal sufficiency in a termination case, we view the evidence in the light most favorable to the finding. *Id.* at 266; *In re T.A.D.*, 397 S.W.3d 835, 839 (Tex. App.—Dallas 2013, no pet.). We "consider all the evidence, not just that which favors the verdict," and we assume the fact-finder resolved disputed facts in favor of its finding if a reasonable fact-finder could do so. *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005) (per curiam); *In re J.F.C.*, 96 S.W.3d at 266. We also disregard all evidence that a reasonable fact-finder could have disbelieved or found to have been incredible. *In re J.F.C.*, 96 S.W.3d at 266.

In reviewing termination findings for factual sufficiency, we consider and weigh all of the evidence. *Id.*; *see also In re A.B.*, 2014 WL 1998440, at *3 (noting reviewing court must undertake "exacting review of the entire record with a healthy regard for the constitutional interests at stake"). We give due deference to the decisions of the fact-finder because the fact-finder is the sole arbiter when assessing the credibility and demeanor of witnesses and do not supplant the judgment with our own. *In re A.B.*, 2014 WL 1998440, at *3; *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006) (per curiam). We determine, on the entire record, whether the evidence is such that a fact-finder could reasonably form a firm conviction or belief about the truth of the allegations against the parent. *In re A.B.*, 2014 WL 1998440, at *3.

### Statutory Grounds for Termination

A trial court may terminate the parent-child relationship if the fact-finder finds by clear and convincing evidence that (1) the parent committed one or more of the enumerated acts or omissions justifying termination under section 161.001(1) of the Texas Family Code and (2) termination of parental rights is in the child's best interest. TEX. FAM. CODE ANN. § 161.001(1)(A)–(T), (2). Both elements must be established, and each required finding must be based on clear and convincing evidence. *In re A.T.*, 406 S.W.3d at 370. "Only one predicate finding under section 161.001(1) is necessary to support a judgment of termination when there is also a finding that termination is in the child's best interest." *In re A.V.*, 113 S.W.3d 355, 362 (Tex. 2003).

In this case, the jury found Mother and Father each had engaged in conduct proscribed by subsections (D) and (E) of section 161.001(1) of the family code. That is, the jury found Mother and Father each had (1) knowingly placed or knowingly allowed J.D.B. to remain in conditions or surroundings which endangered his physical or emotional well-being, TEX. FAM. CODE ANN. § 161.001(1)(D), or (2) engaged in conduct, or knowingly placed J.D.B. with persons who engaged

–15–

in conduct, which endangered his physical or emotional well-being, *id.* § 161.001(1)(E). They challenge the legal and factual sufficiency of the evidence to support these findings in their first and second issues.

Both subsections (D) and (E) require proof of endangerment. *See id.* § 161.001(1)(D), (E). "Endanger" means to expose to loss or injury, or to jeopardize a child's emotional or physical health, but it is not necessary that the conduct be directed at the child or that the child actually suffer an injury. *Castaneda v. Tex. Dep't of Protective & Regulatory Servs.*, 148 S.W.3d 509, 521–22 (Tex. App.—El Paso 2004, pet. denied) (citing *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987)). The primary distinction between the two subsections is the source of the physical or emotional endangerment to the child. *Id.* at 522. Subsection (D) addresses the child's surroundings and environment while subsection (E) address parental misconduct. *Compare* TEX. FAM. CODE ANN. § 161.001(1)(D), *with id.* § 161.001(1)(E). Parental conduct, however, is relevant to the child's environment under subsection (D). *In re J.T.G.*, 121 S.W.3d 117, 125 (Tex. App.—Fort Worth 2003, no pet.). That is, "[c]onduct of a parent or another person in the home can create an environment that endangers the physical and emotional well-being of a child as required for termination under subsection (D)." *Castaneda*, 148 S.W.3d at 522; *see also In re W.S.*, 899 S.W.2d 772, 776 (Tex. App.—Fort Worth 1995, no writ) (stating that "environment" refers not only to the acceptability of the living conditions but also to a parent's conduct in the home). Inappropriate, abusive, or unlawful conduct by persons who live in the child's home is part of the "conditions or surroundings" of the child's home under subsection (D). *In re M.R.J.M.*, 280 S.W.3d 494, 502 (Tex. App.—Fort Worth 2009, no pet.) ("A child is endangered when the environment creates a potential for danger that the parent is aware of but disregards.").

In this case, the Department presented evidence that J.D.B.'s injuries were intentionally inflicted and that the nature of his injuries were consistent with a diagnosis of non-accidental trauma. J.D.B.'s medical records show that when Mother and Father took J.D.B. to Baylor, he had a broken arm, which was a new fracture, and multiple healing fractures of his clavicle, ribs, feet, and femur, that occurred at other times. And after Children's performed three skeletal surveys, the physicians identified a total of twenty-six fractures that were in different stages of healing. J.D.B. was seen by multiple physicians at Children's and underwent extensive testing to rule out the possibility that his fractures were caused by a bone disease or some other underlying medical condition that caused unusual bone fragility, such as rickets. Lang testified that the radiological, blood, and DNA testing ruled out the possibility that J.D.B. had a bone disease, and his Vitamin D levels were not at a level that could cause rickets. In addition, Lang and Cox, both of whom examined J.D.B., testified that after the comprehensive testing and consultation with other physicians, they could not identify any underlying medical explanation for J.D.B.'s fractures. Both physicians also testified that the fact that J.D.B. had not suffered any new fractures after being removed from his parents' care was indicative of abuse rather than a disease process. Lang specifically testified that if you remove the child from the environment and there are no additional fractures, it shows that "whatever was happening, happened in the home."

J.D.B. also had deep healing scratches on his face and a torn frenulum, neither of which would be explained by an underlying bone disease. According to Lang and Cox, J.D.B. could not have self-inflicted these injuries. The scratches were deeper than what would be expected by an infant scratching his face, and the frenulum injury would be caused by someone forcefully shoving something into J.D.B.'s mouth.

The parents presented the testimony and report of Hyman to show there was another reason, other than abuse, for J.D.B.'s fractures. Hyman told the jury that based on J.D.B.'s

skeletal images and lab results, J.D.B. had a metabolic bone process and bone fragility brought on by the risk factors to which he testified. He said J.D.B. also had rickets. Hyman's opinion conflicted with the testimony offered by Lang and Cox and the conclusions written by the multiple other physicians in J.D.B.'s medical records. But that conflict in testimony as to the cause of J.D.B.'s fractures, was a matter of credibility left to the determination of the jury. *See In re H.R.M.*, 209 S.W.3d at 108. The jury was free to believe the medical testimony presented by the Department and disbelieve the parents' medical explanation for J.D.B.'s fractures.

Mother and Father argue the termination finding under subsection (D) is not supported by sufficient evidence because there is no evidence showing they "knowingly" caused J.D.B.'s fractures, tore the child's frenulum, or caused the scratches on his face. Regarding J.D.B.'s fractures, Mother and Father denied harming J.D.B. and maintained throughout the proceedings that they did not know what could have caused J.D.B.'s fractures other than a bone disease. Mother testified that she knew the diagnosis from the physicians at Children's was wrong and that she searched for other causes of infant fractures on the Internet, which led her to Hyman's research. Mother admitted during her testimony that none of the physicians at Children's concluded J.D.B. had a bone disease or rickets and that the testing J.D.B. underwent at Children's specifically ruled out those possibilities. But despite this evidence, she believes Hyman's testimony that J.D.B. had healing rickets. Father agreed that the only testimony that made sense to him was Hyman's testimony. Carpenter testified that Mother's only explanation for why J.D.B. did not receive any new fractures after being removed from their care was that J.D.B. was healing from brittle bone disease. The record contains no other explanation by either parent for why J.D.B. did not receive additional fractures after removal. Hyman offered only that J.D.B.'s cellular biology changed his situation and his x-rays showed changes of increased mineralization.

–18–

Regarding J.D.B.'s other injuries, Mother said J.D.B.'s torn frenulum was just a surface cut caused by the nipple shield, but that testimony was contradicted by Lang and Cox; they said a nipple shield could not cause a frenulum tear. Mother and Father also told the physicians and CPS that J.D.B. scratched his face and that they trimmed his nails and used "scratch mittens." But the jury also heard that the scratches were deeper that what a child J.D.B.'s age could inflict. Hyman did not offer an explanation for the scratches to J.D.B.'s face or his torn frenulum. He offered only that a torn frenulum is not necessarily a sign of child abuse.

The jury heard that except for one hour, Mother and Father were J.D.B.'s primary caregivers. Mother said she knew "exactly what was going on" the entire time and how J.D.B. was handled. Although Mother and Father both testified that they did not have concerns about the other, the jury also heard that Mother told Duane she would seek sole custody of J.D.B. due her concerns about Father's anger issues. Mother said she did not remember discussing this with Duane.

Mother testified that the during the time J.D.B. was in their care, he never seemed like he was in pain and he was not fussy, unless he was hungry or wet. And they took J.D.B. to receive care whenever they noticed a problem, and that the physicians in Florida said J.D.B. was fine. But while it is true that Mother and Father sought medical care the times they noticed a problem, that evidence does not negate the jury's finding that Mother and Father each permitted J.D.B. to remain in a setting that was dangerous to him. *See In re J.P.B.*, 180 S.W.3d at 574. The evidence shows that J.D.B. sustained twenty-six fractures, which Lang described as on the severe end of child abuse, during the time when he was under their care and that those fractures were caused by non-accidental trauma. The evidence also shows that the fractures did not occur all at once; rather, the fractures were in different stages of healing. Lang testified that it takes a considerable amount of force to break an infant's bones and that when it happens, you know it

and the child is in pain. In light of this evidence, a reasonable jury could infer that, even though J.D.B. was not fussy and Mother and Father sought medical treatment when they noticed a problem, they nevertheless knowingly allowed J.D.B. to remain in an environment that endangered his physical well-being. *Id.*; *see also C.H. v. Tex. Dep't of Family & Protective Servs.*, 389 S.W.3d 534, 541 (Tex. App.—El Paso 2012, no pet.) (concluding sufficient evidence exists to support finding under subsection (D) where child's broken bones were not explained); *In re J.D.*, No. 14-14-00076-CV, 2014 WL 2583784, at *7 (Tex. App.—Houston [14th Dist.] June 10, 2014, no pet. h.) ("A child's unexplained, non-accidental fractures of various ages support a reasonable inference that the child's caregivers knew of the injuries and their cause, and supports termination under subsection D."). Further, it was within the province of the jury to judge Mother's and Father's credibility and demeanor and disbelieve their testimony that they did not know how the fractures could have occurred.

After viewing all of the evidence under the appropriate standards of review, we conclude the fact-finder could reasonably form a firm belief or conviction that Mother and Father each knowingly placed or allowed J.D.B. to remain in conditions or surroundings that endangered his physical or emotional well-being. *In re J.F.C.*, 96 S.W.3d at 266. Accordingly, we conclude the evidence was legally and factually sufficient to support the termination finding for Mother and Father under subsection (D). We overrule Mother's and Father's first issue.

A single predicate finding under section 161.001(1) is sufficient to support a judgment of termination when there is also a finding that termination is in the child's best interest. *See In re A.V.*, 113 S.W.3d at 362. Here, the jury also made best interest findings as to each parent, and as will be explained in more detail below, the evidence is legally and factually sufficient to support those findings. Thus, we do not address Mother's and Father's second issue, which challenges the finding that each had engaged in conduct proscribed by subsection (E). TEX. R. APP. P. 47.1.

–20–

**Best Interests of the Child**

Before terminating a parent's rights, the fact-finder also must find that terminating the parent's rights is in the child's best interest. TEX. FAM. CODE ANN. § 161.001(2); *see also In re A.V.*, 113 S.W.3d at 362 (noting that primary focus of termination proceeding in the trial court and on appeal is protecting the best interest of the child). In their third issue, Mother and Father challenge the legal and factual sufficiency of the evidence supporting the best interest findings.

In reviewing the sufficiency of the evidence to support a finding that termination is in the child's best interest, a court examines several factors, including the desires of the child; the child's current and future emotional and physical needs; any emotional or physical danger to the child; the parental abilities of the persons seeking custody and their plans for the child; the programs available to assist those persons seeking custody in promoting the best interest of the child; the stability of the home; acts or omissions by a parent tending to show the existing relationship is not a proper one; and any excuse for the acts or omissions of the parent. *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976) (listing factors used for determining best interest of the child). These factors are not exhaustive, and some of the listed factors may be inapplicable to some cases. *In re C.H.*, 89 S.W.3d 17, 27 (Tex. 2002).

While there is a strong presumption that keeping the child with a parent is in the child's best interest, *see* TEX. FAM. CODE ANN. § 153.131(b), the prompt and permanent placement of the child in a safe environment also is presumed to be in the child's best interest. *Id.* § 263.307(a). Section 263.307(b) of the family code lists the factors to consider in determining whether the child's parents are willing and able to provide the child with a safe environment. *See* TEX. FAM. CODE ANN. § 263.307(b)(1)–(13). The statutory best interest factors include, among other things, the child's age and physical and mental vulnerabilities; the magnitude, frequency, and circumstances of the harm to the child; whether the perpetrator of the harm is

identifiable; the willingness and ability of the child's family to effect positive environmental and personal changes; and whether the child's family demonstrates adequate parenting skills. *Id.*

In answering the "best interest portion of the questions," the jury was instructed to consider both the statutory and *Holley* factors. Mother and Father, however, focus their combined legal and factual sufficiency argument on just the *Holley* factors. We therefore limit our discussion to those factors.

At the time of trial, J.D.B. was less than two years old and was too young to express his desires. But the evidence shows he bonded with Duane and his family and was well-cared for by them. *In re J.M.*, 156 S.W.3d 696, 706 (Tex. App.—Dallas 2005, no pet.). While he has had visitation with Mother and Father since the time of his removal from their care, the visits were limited to a few hours at a time, one or two days each week, and Duane testified J.D.B. was hesitant around his parents. Duane also described the relationship between J.D.B. and Mother and Father as "strained." Duane testified J.D.B. is healthy and growing and that he would adopt J.D.B. if he were available for adoption. The Department supports J.D.B.'s adoption by Duane. Mother's family members testified to their concerns about J.D.B. staying with Duane because of his character. But the character attacks were not so significant that the jury could not have reasonably formed a firm belief or conviction that J.D.B.'s placement with Duane was in his best interest. And the jury is the sole judge of the credibility of those witnesses and was free to disbelieve their testimony. Importantly, although the family members testified to their concerns regarding Duane's character, no person testified that J.D.B. was not well-cared for by Duane. Further, neither Mother nor Father asked for J.D.B. to be removed from Duane's care and placed somewhere else. Nor did any of the family members that testified to their concerns about Duane.

Regarding J.D.B.'s present and future emotional and physical needs and the danger to him, the evidence shows that while in Mother's and Father's care (which was forty-one days),

J.D.B. suffered twenty-six fractures, a torn frenulum, and scratches to his face. Mother and Father said they were his primary caregivers, and Mother could account for only an hour when J.D.B. was not in her care. She saw how he was handled not only by Father but also by other family members. After J.D.B. was removed from their care, he has had no further injuries. He is not on any special medications to treat for an underlying bone disease and is growing and healthy.

Mother and Father consistently denied any knowledge of how J.D.B.'s fractures occurred, and their explanation for his fractures was rejected by the lab results and the physicians who treated him. They also denied having any problems that could be addressed by counseling. The fact-finder may infer from past conduct endangering the child's well-being that similar conduct will recur if the child is returned to the parents' care. *In re M.R.J.M.*, 280 S.W.3d at 502. Frederick was especially troubled by the fact that Mother persisted in explaining the causes of J.D.B.'s fractures as bone disease and lacked the empathy she would expect to see from a Mother whose child sustained these types of injuries.

In addition to the evidence presented above, Duane testified that Mother and Father lacked parental instincts and seemed to struggle caring for J.D.B., even after attending the parenting classes. Although Mother and Father provided differing testimony as to how the visits with J.D.B. went, again, they did not dispute that J.D.B. was well-cared for by Duane.

The need for stability and permanence are important considerations in determining a child's best interest. *See In re T.D.C.*, 91 S.W.3d 865, 873 (Tex. App.—Fort Worth 2002, pet. denied). Mother testified to their plans for J.D.B. if he was returned to them. Specifically, the jury heard that Mother and Father were no longer together; according to Mother, they broke up because their "future goals for [themselves] and plans for [J.D.B.] were slightly different." But she said they are on good terms. Mother stated she and Father would share joint custody of

–23–

J.D.B. with Father clarifying that J.D.B. would primarily reside with Mother. If their parental rights were terminated, they also asked for J.D.B. to be placed with Mother's mother, Stephanie, and Mother's step-father, Brannon, instead of remaining with Duane. Stephanie and Brannon were separated at the time of trial. Before Mother and Father broke up, they lived together at Stephanie's; after they broke up, Mother moved into an apartment with her new boyfriend, who has a pending criminal charge.

Brannon claimed that Duane lacked stability because of Brannon's speculation about Duane's employment. Despite Brannon's claims, the jury heard that Duane had been employed by the same company for over twenty years and was financially able to provide for J.D.B. The jury was free to compare the plans for J.D.B. described by Mother and Father with J.D.B.'s current placement and the Department's future plans for him, which was for J.D.B. to remain with Duane. J.D.B. has lived with Duane for the majority of his life, and the evidence showed that he was thriving in that environment.

In addition to the above, the jury also may have considered the magnitude and circumstances of J.D.B.'s injuries, which Lang described as severe, and J.D.B.'s vulnerability because he was an newborn. TEX. FAM. CODE ANN. § 263.307(b)(1), (3). Based on our review of the record, we conclude the evidence presented at trial and summarized above is legally and factually sufficient to support the findings that termination of Mother's and Father's parental rights was in J.D.B.'s best interest. *See* TEX. FAM. CODE ANN. § 161.001(2); *Holley*, 544 S.W.2d at 371–72. We overrule Mother's and Father's third issue.

Having overruled Mother's and Father's three issues, we affirm the trial court's judgment terminating Mother's and Father's parental rights.

/Ada Brown/
ADA BROWN
JUSTICE

140037F.P05



## Court of Appeals
## Fifth District of Texas at Dallas

## JUDGMENT

IN THE INTEREST OF J.D.B., A CHILD

No. 05-14-00037-CV

On Appeal from the 304th Judicial District Court, Dallas County, Texas
Trial Court Cause No. 12-771-W.
Opinion delivered by Justice Brown.
Justices O'Neill and Myers participating.

In accordance with this Court's opinion of this date, the judgment of the trial court is **AFFIRMED**.

It is **ORDERED** that appellee, the Texas Department of Family and Protective Services, recover its costs of this appeal from appellants, Darlyn Ashley Harrell and Adam Zacharus Bonham.

Judgment entered this 17th day of June, 2014.

/Ada Brown/
ADA BROWN
JUSTICE