**Affirmed; Opinion Filed June 21, 2018.**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

## No. 05-17-01482-CV

## IN THE INTEREST OF C.E.C., A MINOR CHILD

**On Appeal from the 255th Judicial District Court**
**Dallas County, Texas**
**Trial Court Cause No. DF-08-10464**

## MEMORANDUM OPINION
Before Justices Lang, Brown, and Whitehill
Opinion by Justice Lang

Appellant ("Father") appeals the trial court's order terminating his parental rights respecting his daughter, C.E.C. Following a bench trial, the trial court found by clear and convincing evidence that (1) Father committed three statutory predicate acts supporting termination and (2) termination of Father's parental rights was in C.E.C.'s best interest. Additionally, the trial court appointed C.E.C.'s paternal grandmother ("Grandmother") and her husband, Randy, (collectively, "petitioners") as "sole managing conservators" of C.E.C. and ordered two permanent injunctions against Father respecting access to C.E.C.

In three issues on appeal, Father contends (1) the evidence is legally and factually insufficient to support a finding that termination of his parental rights is in the best interest of C.E.C. and (2) the trial court abused its discretion by appointing petitioners as sole managing

conservators and ordering the permanent injunctions against Father. We decide Father's three issues against him. The trial court's judgment is affirmed.

## I. FACTUAL AND PROCEDURAL CONTEXT

C.E.C. was born in 2006. On May 26, 2016, an "Original Petition to Terminate Parent–Child Relationship of [Father]" was filed by Grandmother, who at that time was temporary sole managing conservator of C.E.C.[1] The live petition at the time of trial requested involuntary termination of Father's parental rights based on six of the acts and omissions enumerated in family code section 161.001(b)(1) and the best interest of C.E.C. *See* TEX. FAM. CODE ANN. § 161.001(b)(1)–(2) (West Supp. 2017).[2] Also, petitioners sought adoption of C.E.C.

At trial, Father appeared by telephone and through his appointed counsel. Father testified in part (1) in January 2010, he "pleaded guilty to attempted receipt of child pornography"; (2) since that time, he has been in federal prison for that offense; (3) he is serving a 210-month sentence and expects to be released in 2024; (4) although his mother, i.e., Grandmother, claims he sent her a letter from prison admitting to sexual conduct with minors, he did not write or sign any such letter; (5) he has never physically, sexually, or emotionally abused C.E.C.; and (6) he believes he is "a good father." Father stated he was asking (1) that his parental rights not be terminated; (2) that he be allowed "future contact" with C.E.C.; and (3) that C.E.C. not be placed in the care of Grandmother because Grandmother "is a danger to her" and placement with Grandmother is not in C.E.C.'s best interest. Further, (1) a copy of Father's 2010 plea agreement was entered into

---

[1] The original petition was subsequently amended to add Randy as a petitioner and also seek termination of the parental rights of C.E.C.'s mother. At the start of trial, the trial court severed "mother's portion" from this case for determination at a later time.

[2] The provisions of family code section 161.001 cited in the live petition in this case have been amended. *See* Act of May 26, 2017, 85th Leg., R.S., ch. 317, § 12, eff. Sept. 1, 2017; Act of Mar. 30, 2015, 84th Leg., R.S., ch. 1, § 1.078, sec. 161.001, 2015 Tex. Sess. Law Serv. 1, 18–20. Former subsection 161.001(1) is now designated as subsection 161.001(b)(1) and former subsection 161.001(2) is now designated as subsection 161.001(b)(2). FAM. § 161.001. The language contained within the subsections relevant to this case remains the same and the amendments do not affect the resolution of this appeal. *See id*. We cite the current version of the statute in this opinion. *See In re A.R.M*., No. 05-17-00539-CV, 2018 WL 1559820, at *2 n.2 (Tex. App.—Dallas Mar. 30, 2018, no pet. h.) (mem. op.).

evidence and (2) Father testified his plea was voluntary and he "gave complete and truthful information" in that plea agreement.

Additionally, Father testified on cross-examination (1) at the time of his arrest, he was living in Grandmother's home; (2) multiple computers found in that home contained a total of more than 1,200 images and videos of child pornography; (3) those computers were owned by Grandmother; and (4) he recently attempted to contact C.E.C., but Grandmother has not allowed C.E.C. to visit or speak with him since receiving the letter described above.

Grandmother testified she is a licensed provider of "in home child care" and has been "in that industry" for more than twenty years. She stated she sought to terminate Father's parental rights to C.E.C. after Father sent her a handwritten letter from prison in 2016 "saying not only did he look at children," but also "sexually assaulted [C.E.C.]" when she was three and one-half years old. Grandmother testified Father stated in that letter that he (1) is a "violent sexual predator"; (2) "if given the opportunity, may likely attempt to sexually abuse a minor female in the future"; and (3) believes his parental rights respecting C.E.C. should be terminated. A copy of the letter described by Grandmother was admitted into evidence over Father's objection.

Further, Grandmother testified she believes termination of Father's parental rights would be in C.E.C's best interest. Specifically, Grandmother stated (1) it is her belief that C.E.C. believes Father "sexually abused her"; (2) C.E.C. has been in therapy respecting that matter; (3) Grandmother is concerned Father will try to harm C.E.C. mentally and physically if he has access to her; and (4) termination would "give [C.E.C.] some closure" and "let[] [her] know that she's in a safe place, and that her biological father . . . can never hurt her or bother her until she's ready to talk to him." Also, Grandmother testified (1) C.E.C. is currently "thriving" in her care and knows Grandmother and Randy "want to adopt her so she won't have to go back to live with her mother or see her father"; (2) "[t]here's no reason" to allow Father "access to" C.E.C.; and (3) as

–3–

a "self-admitted violent sexual predator," Father cannot "provide any kind of emotional support for [C.E.C.]."

On cross-examination, Grandmother testified Father "has not been able to provide financial support to his child" while he has been in prison, but has attempted to contact Grandmother to "provide emotional support for the child." She stated that since receiving the letter described above, she has not "been in contact with Father regarding the wellbeing of the child" or allowed Father to speak with C.E.C. Further, Grandmother stated she is certain Father wrote and signed that letter because "I know his handwriting" and Father told her in a telephone call from prison that he wrote the letter. Additionally, Grandmother stated (1) she testified at Father's "detention hearing" in 2010 that she was responsible for the production of two "nude imagines [sic]" of C.E.C. found in her home; (2) her child care business was "at one point" "placed under investigation by the department of protective services" and was "forcibly shut down" by them in January 2010, but is currently operating legally; (3) she was "accused of harming a child" approximately a year and a half ago, but "the case was closed"; (4) she has never physically abused any of her children and has never "been verbally, or physically, or emotionally abusive towards C.E.C."; (5) in July 2016, police were called to her home regarding a reported "assault" of her nephew by Randy, but it was "a big misunderstanding" and no one was arrested or cited; (6) prior to receiving the letter described above, she took C.E.C. to visit Father in prison twelve or thirteen times; (7) those visits went "okay" and one of the visits was "nice,"; (8) sometimes C.E.C. was "withdrawn" and "kind of sad" after the visits, and (9) prior to Grandmother's receipt of the letter described above, C.E.C. was "in therapy" because of "sexual misconduct with an uncle" on "the stepfather's side" that occurred while she was living with her mother.

Tony Godwin testified he is a detective with the Garland Police Department. He stated he serves on a task force that assisted federal agents with the child pornography investigation that

resulted in Father's arrest and incarceration. The images found in that investigation involved children "at the same age range" as those "that were in his presence in the day care that his mother ran." Godwin testified that, given the offense for which Father was convicted, he feels strongly that Father should not be around children because "the past tells me that his pattern of behavior has been horrific for a long time" and "the recidivism rate for something like this is very high." Also, Godwin testified he believes termination of Father's parental rights would be in C.E.C.'s best interest.

Alyssa Green testified she taught C.E.C. in fourth grade two years ago and has "kept in touch" with Grandmother since that time. Green stated (1) Grandmother has played a supportive role in C.E.C.'s life, (2) C.E.C. "has consistently improved while she's been in [Grandmother's] care" and is "nurtured" and "thriving" in the care of Grandmother, (3) she does not "have any concerns" respecting Grandmother, and (4) she believes "it would be harmful" for C.E.C. to be removed from Grandmother.

Patricia Keyhoe testified she was C.E.C.'s fifth grade teacher. She testified Grandmother has been "very involved" in C.E.C.'s life and C.E.C. is "thriving" in Grandmother's care. Keyhoe stated she believes it would be in C.E.C.'s best interest to remain in Grandmother's care and it would be detrimental to C.E.C. to remove her from Grandmother. On cross-examination, Keyhoe testified she has never met Father and C.E.C. has not talked to her about him.

Randy testified he and Grandmother were married in January 2016. He has never met Father. He stated that during a previous marriage, he and his then-wife were foster parents for several teenagers. During that time, "at least three" allegations against him were investigated by "Child Protective Services," but "nothing occurred from them." He is not aware of any other instances in which CPS has been called regarding him. Also, he stated (1) he knows of only one instance involving a report of domestic violence at Grandmother's home, which occurred when

C.E.C.'s mother "showed up and got violent there," and (2) he has never witnessed Grandmother being verbally, physically, or sexually abusive in any way.

Randy testified Father has not supported C.E.C. financially for at least two years prior to the filing of the petition in this case. He stated Father's contact with C.E.C. during her visits to prison was supervised by a friend of the family on two occasions and was otherwise supervised by Grandmother. Further, Randy stated he has "concerns" that C.E.C. will be "manipulated" emotionally and "possibly hurt physically" if "exposed to her biological father."

Jarrod Opel testified he is an investigator with Child Protective Services. He investigated allegations made in 2015 respecting C.E.C.'s mother. At that time, Father was in prison and those allegations did not involve him. Opel stated he met with C.E.C. and she "was doing very well" in Grandmother's care. Further, Opel stated (1) he visited Grandmother's home and found it "appropriate" for C.E.C.; (2) Grandmother is "very vested in making sure [C.E.C.] is thriving,"; (3) he has no concerns about Grandmother; and (4) he believes termination of Father's parental rights is in C.E.C.'s best interest.

> During closing, counsel for Father stated in part,
>
> Your Honor, . . . we are asking that termination not take place at this time based on the testimony today. . . .
> . . . .
> We are also requesting that the Court allow at least some type of phone contact if the child desires to have it. And if the child does, that the petitioners select a reasonable time of day and allow some type of Skype or FaceTime.
> . . . .
> [Father] is requesting that the petitioner set up some type of personal e-mail account for the child and allow the child to respond with her father on a regular basis as long as the communication is supervised by petitioners.
> . . . .
> . . . If my client is released, we're also asking that he allow—if allowed by his probation officer to attend school activities, [sic] if the child wishes to visit.
> . . . .
> And Your Honor, just one more thing that I meant to add. If the Court does deem that termination is in the child's best interest, we're asking for the same type of requested relief that we would have done under a possessory conservatorship,

which would include supervised access at all times, cards, pictures, and letters, and all other requests that was previously—or just recently requested of the Court.

At that point, C.E.C.'s amicus attorney stated, "Your Honor, . . . I believe it is not in the child's best interest to have any access to [Father], who is currently incarcerated because of child pornography. And there is no situation in which the child needs access or even communication with [Father]."

The trial court signed an October 27, 2017 order in which it stated in part that it finds by clear and convincing evidence that (1) Father "knowingly engaged in criminal conduct that has resulted in the parent's: conviction of an offense and imprisonment and inability to care for the child for not less than two years from the date of filing of the petition" and (2) "termination is in the best interest of the child." Further, the trial court (1) appointed Grandmother and Randy "sole managing conservators" of C.E.C. and (2) ordered permanent injunctions against Father "sending any written or electronic correspondence to any school that the child currently attends, or any schools the child attends in the future, or the residence of the paternal grandparent" and "attempting to contact the child by telephone." This appeal timely followed.

## II. TERMINATION OF FATHER'S PARENTAL RIGHTS

### A. Standard of Review

Because termination of parental rights is complete, final, and irrevocable, the evidence in support of termination must be clear and convincing before a court may involuntarily terminate a parent's rights. *In re N.T.*, 474 S.W.3d 465, 474–75 (Tex. App.—Dallas 2015, no pet.); *see also In re A.B.*, 437 S.W.3d 498, 502–03 (Tex. 2014); *In re J.D.B.*, 435 S.W.3d 452, 462 (Tex. App.—Dallas 2014, no pet.). "Clear and convincing evidence" is "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." *N.T.*, 474 S.W.3d at 475 (quoting FAM. § 101.007).

On appeal, we apply a standard of review that reflects the elevated burden at trial. *Id*. This means both legal and factual sufficiency review of a decree terminating parental rights require a reviewing court to consider all the evidence to determine whether the fact-finder could reasonably form a firm belief or conviction that the grounds for termination are proven. *J.D.B.*, 435 S.W.3d at 462 (citing *In re J.F.C.*, 96 S.W.3d 256, 265–66 (Tex. 2002)). Further, under both the legal and factual sufficiency standards, the appellate court must defer to the fact-finder's determinations as to witness credibility. *N.T.*, 474 S.W.3d at 475.

In evaluating the evidence for legal sufficiency in a termination case, we view the evidence in the light most favorable to the finding. *J.D.B.*, 435 S.W.3d at 462; *In re T.A.D.*, 397 S.W.3d 835, 839 (Tex. App.—Dallas 2013, no pet.). We "consider all the evidence, not just that which favors the verdict," and we assume the fact-finder resolved disputed facts in favor of its finding if a reasonable fact-finder could do so. *J.D.B.*, 435 S.W.3d at 462–63 (citing *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005)). We disregard all evidence that a reasonable fact-finder could have disbelieved or found to have been incredible. *Id*. at 463; *see In re K.M.L.*, 443 S.W.3d 101, 116 (Tex. 2014).

When reviewing the factual sufficiency of the evidence supporting a termination finding, an appellate court asks whether, in light of the entire record, the evidence is such that a fact-finder could reasonably form a firm conviction about the truth of the allegations. *N.T.*, 474 S.W.3d at 475. We must give due consideration to evidence that the fact-finder could reasonably have found to be clear and convincing. *A.B.*, 437 S.W.3d at 503. "If, in light of the entire record, the disputed evidence that a reasonable fact-finder could not have credited in favor of the finding is so significant that a fact-finder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient." *Id*. (quoting *J.F.C.*, 96 S.W.3d at 266).

### B. Applicable Law

The trial court may terminate the parent–child relationship if the fact-finder finds by clear and convincing evidence that the parent committed one or more of the acts and omissions enumerated in family code section 161.001(b)(1) and termination is in the child's best interest. FAM. § 161.001(b)(1)–(2). The acts and omissions in section 161.001(b)(1) include that "the parent has: . . . knowingly engaged in criminal conduct that resulted in the parent's: (i) conviction of an offense; and (ii) confinement or imprisonment and inability to care for the child for not less than two years from the date of filing the petition." *Id*. § 161.001(b)(1)(Q).

A judicial determination of the "best interest" of a child "is not dependent upon, or equivalent to, a finding that the child has been harmed by abuse or neglect or is in danger of such harm." *In re M.J.P.*, No. 05-16-01293-CV, 2017 WL 655955, at *6 (Tex. App.—Dallas Feb. 17, 2017, no pet.) (mem. op.). Rather, "best interest" is "a term of art encompassing a much broader, facts-and-circumstances based evaluation that is accorded significant discretion." *Id*. (quoting *In re Lee*, 411 S.W.3d 445, 460 (Tex. 2013) (orig. proceeding)); *see also In re C.R.*, 263 S.W.3d 368, 375 (Tex. App.—Dallas 2008, no pet.) ("[P]arental rights may not be terminated merely because a child might be better off living elsewhere."). In reviewing a fact-finder's best interest finding, we consider several nonexclusive factors, including (1) the child's desires, (2) the child's current and future emotional and physical needs, (3) current and future emotional and physical dangers to the child, (4) the parental abilities of those seeking custody, (5) the programs available to help those individuals promote the child's best interest, (6) those individuals' plans for the child, (7) the home's or proposed placement's stability, (8) the parent's acts or omissions indicating that the existing parent–child relationship is not a proper one, and (9) any excuse for the parent's acts or omissions. *Id*. (citing *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976)). An absence of evidence of some *Holley* factors does not preclude a finding that termination is in the child's best

interest, particularly if undisputed evidence shows that the parental relationship endangered the child's safety. *In re A.R.M.*, No. 05-17-00539-CV, 2018 WL 1559820, at *2 (Tex. App.—Dallas Mar. 30, 2018, no pet. h.) (mem. op.) (citing *N.T.*, 474 S.W.3d at 477). Further, the same evidence can be relevant to both section 161.001(b)(1) termination grounds and the child's best interest. *In re D.W.*, 445 S.W.3d 913, 925 (Tex. App.—Dallas 2014, pet. denied).

### C. Application of Law to Facts

In his first issue, Father contends the evidence is legally and factually insufficient to show termination of his parental rights was in the best interest of C.E.C. According to Father, there was little or no evidence as to several *Holley* factors and "based on the record, a reasonable fact-finder could not form a firm conviction or belief that termination of [Father's] parental rights is in the best interest of [C.E.C.]."

The first *Holley* factor is C.E.C.'s desires. There is no direct testimony as to those desires. Father cites evidence that, prior to Grandmother's receipt of the letter described above, at least one of C.E.C.'s visits to see him in prison was "nice." Additionally, he states without citation to authority or to the evidence that "[i]f the child desires to see her father again in the future, it is in her best interest to not have her father's rights terminated." "[E]vidence that a child . . . enjoys visits is only marginally relevant to a best interest finding." *Id.* at 926. On this record, we conclude this factor is neutral, weighing neither in favor of nor against termination of parental rights. *See id.*

Next, we consider together the second, fourth, and fifth *Holley* factors. The second factor considers the child's current and future physical and emotional needs, the fourth factor considers the parental abilities of the person seeking custody, and the fifth factor considers the programs available to assist the person seeking custody in promoting the best interest of the child. Father argues it is "not necessary" to terminate his parental rights for C.E.C.'s physical needs to be met

or for her to continue therapy and continue to thrive in school. Further, he asserts he has "provided emotional support to C.E.C." In support of that assertion, he cites Grandmother's testimony that he has attempted to contact her to provide C.E.C. emotional support. Also, Father states that he "expresses serious concerns about the current home of the child" and cites testimony by him that Grandmother is "telling [C.E.C.] a bunch of stories that I have abused her as a child." According to Father, his testimony "calls into question the emotional needs of the child and the need for her to maintain a relationship with her father, at least a legal relationship, so that the child can be aware of the truth and hear her father's side of the story." The record shows the testimony cited by Father respecting the "stories" told by Grandmother was objected to by C.E.C.'s amicus attorney on the grounds of hearsay and speculation and those objections were sustained by the trial court. Father does not complain on appeal as to the trial court's ruling respecting that evidence. However, even assuming without deciding that all evidence cited by Father is to be considered in this Court's analysis, the evidence in the record also includes testimony by Grandmother that (1) Father sent her a handwritten letter from prison in 2016 "saying not only did he look at children," but also "sexually assaulted [C.E.C.]" when she was three and one-half years old; (2) Father stated in that letter that he is a "violent sexual predator," "may likely attempt to sexually abuse a minor female in the future," and "believes his parental rights respecting C.E.C. should be terminated"; and (3) as a "self-admitted violent sexual predator," Father cannot "provide any kind of emotional support for [C.E.C.]." Additionally, the record shows (1) Father did not testify as to any program available to him respecting C.E.C.'s future physical and emotional needs and (2) three witnesses, i.e., Green, Keyhoe, and Opel, testified C.E.C. is thriving in Grandmother's care. On this record, we conclude these factors weigh in favor of termination of Father's parental rights. *See M.J.P.*, 2017 WL 655955, at *7 (addressing second, fourth, and fifth *Holley* factors together in case involving

–11–

termination of parental rights of father incarcerated for sexual assault of child); *see also N.T.*, 474 S.W.3d at 475 (appellate court must defer to fact-finder's determinations as to witness credibility).

The third *Holley* factor is the emotional and physical danger to the child now and in the future. Father asserts he (1) "poses no danger to [C.E.C.'s] physical well-being while he is incarcerated"; (2) "was not involved in any CPS investigations involving the child or her family"; and (3) "poses no emotional danger to [C.E.C.], but rather, "has provided emotional support." In support of those assertions, Father cites Grandmother's testimony described above that he has attempted to contact her to provide C.E.C. emotional support. Also, Father (1) contends "[e]motional danger could occur to the child if [Father's] rights are terminated, allowing Petitioners to continue to lie or confuse the child about [Father]" and (2) states without citation to authority or to the record that "[e]motional danger will occur to the child if she is not allowed to continue a relationship with her father." However, as described above, the record also shows (1) Father stated in the letter described by Grandmother that he is a "violent sexual predator" and "may likely attempt to sexually abuse a minor female in the future"; (2) Godwin testified Father should not be around children because "the past tells me that his pattern of behavior has been horrific for a long time" and "the recidivism rate for something like this is very high"; (3) both Grandmother and Randy testified they are concerned Father will try to harm C.E.C. physically and emotionally if he has access to her; and (4) Grandmother stated termination would "give [C.E.C.] some closure" and "let[] [her] know that she's in a safe place, and that her biological father . . . can never hurt her or bother her until she's ready to talk to him." We conclude this factor weighs in favor of termination of Father's parental rights to C.E.C.

Next, we consider together the sixth and seventh *Holley* factors, the plans for the child and the stability of the home or proposed placement. As described above, petitioners sought adoption of C.E.C. "so she won't have to go back to live with her mother or see her father." Father contends

(1) there are "other ways to achieve these two goals" without termination of his parental rights; (2) "there is no reason why the child cannot see her father; he poses no danger to her"; (3) "[t]here was not enough evidence given to prove the stability of the home or proposed placement"; (4) [t]he stability of the home was called into question with testimony that the police have had to visit the home"; and (5) Grandmother and Randy "have only been married since January 1, 2016; this is not long enough to establish stability." In support of those arguments, Father cites testimony that police were called to Grandmother's home on two occasions. However, the record shows (1) one of those visits by police involved violence by C.E.C.'s mother and the other involved "a big misunderstanding"; (2) Green testified C.E.C. "has consistently improved while she's been in [Grandmother's] care" and is "nurtured" and "thriving" in the care of Grandmother; (3) Keyhoe testified Grandmother has been "very involved" in C.E.C.'s life and C.E.C. "is thriving" in her care; (4) Opel stated Grandmother's home is "appropriate" for C.E.C. and Grandmother is "very vested in making sure [C.E.C.] is thriving,"; and (5) Green, Keyhoe, and Opel testified they do not "have any concerns" respecting Grandmother. On this record, we conclude these factors weigh in favor of termination of Father's parental rights. *See M.J.P.*, 2017 WL 655955, at *7.

Finally, we consider together the eighth and ninth *Holley* factors, the parent's acts or omissions indicating that the existing parent–child relationship is not a proper one and any excuse for the parent's acts or omissions. Father argues in part,

> There is no evidence given that [Father] has done anything which indicates the existing parent–child relationship is not appropriate. Throughout the trial, Petitioners rely solely on a handwritten letter to demonstrate that it is in the child's best interest that [Father's] rights be terminated. [Father] vehemently denies writing the letter. He denies ever touching his child or any child in an appropriate [sic] way.

(citations to record omitted). Additionally, Father states "[t]here is no evidence provided regarding any excuses for the parent's acts." As described above, under both the legal and factual sufficiency standards, the appellate court must defer to the fact-finder's determinations as to witness

–13–

credibility. *N.T.*, 474 S.W.3d at 475. The record shows Grandmother testified Father's handwritten letter stated he "sexually assaulted [C.E.C.]" when she was three and one-half years old," is a "violent sexual predator," "may likely attempt to sexually abuse a minor female in the future," and believes his parental rights respecting C.E.C. should be terminated. Further, the record contains evidence that after writing the letter in question and sending it to Grandmother, Father lied about doing so. "Given the gravity of Father's actions and his failure to recognize that his conduct was detrimental" to C.E.C., we conclude these two factors weigh in favor of termination of Father's parental rights. *See M.J.P.*, 2017 WL 655955, at *7.

As described above, an absence of evidence of some *Holley* factors does not preclude a finding that termination is in the child's best interest, particularly if undisputed evidence shows that the parental relationship endangered the child's safety. *N.T.*, 474 S.W.3d at 477; *A.R.M.*, 2018 WL 1559820, at *2. Considering the *Holley* factors and the record as a whole, we conclude the evidence is legally and factually sufficient to support the trial court's finding that termination of Father's parental rights was in C.E.C.'s best interest. *See Holley*, 544 S.W.2d at 371–72; *see also J.D.B.*, 435 S.W.3d at 462–63; *A.B.*, 437 S.W.3d at 502–03.

We decide Father's first issue against him.

### III. CONSERVATORSHIP

In a suit affecting the parent–child relationship, the trial court may appoint a sole managing conservator. *See* FAM. §§ 153.005(a), 161.207(a). A managing conservator must be a parent, a suitable, competent adult, the Department of Family and Protective Services, or a licensed child-placing agency. *Id*. § 153.005(b), 161.207(a). "The best interest of the child shall always be the primary consideration of the court in determining the issues of conservatorship and possession of and access to the child." *Id*. § 153.002.

In his second issue, Father contends the trial court abused its discretion by appointing petitioners as sole managing conservators of C.E.C. because the evidence is legally and factually insufficient to support the finding that it is in C.E.C.'s best interest to remain in their home. However, an order terminating the parent–child relationship divests the parent of all legal rights and duties with respect to the child. *Id*. § 161.206(b). Because we have decided against Father regarding his challenge to the portion of the trial court's order terminating his parental rights, that order has divested Father of his legal rights and duties respecting C.E.C. *See In re D.K.W., Jr.*, No. 01-17-00622-CV, 2017 WL 6520439, at *5 (Tex. App.—Houston [1st Dist.] Dec. 21, 2017, pet. denied) (mem. op.). As a result, Father does not have standing to challenge the portion of the order appointing petitioners as sole managing conservators of C.E.C. because any alleged error could not injuriously affect his rights. *Id*. (affirming termination of mother's parental rights and holding that mother, who had been divested of her legal rights to child, had no standing to challenge conservatorship determination).

We decide against Father on his second issue.

### IV. PERMANENT INJUNCTIONS AGAINST FATHER

#### A. Standard of Review and Applicable Law

In lawsuits affecting the parent–child relationship, we review a trial court's permanent injunction contained within an order for an abuse of discretion. *See In re S.V*., No. 05-16-00519-CV, 2017 WL 3725981, at *8 (Tex. App.—Dallas Aug. 30, 2017, pet. denied) (citing *Peck v. Peck*, 172 S.W.3d 26, 36 (Tex. App.—Dallas 2005, pet. denied)). "In matters concerning custody, control, possession, and visitation, the trial court's foremost consideration is the best interest of the child, and the court has discretion to fashion orders including injunctive relief that are in the best interest of the child and consistent with the allegations, general prayers for relief, and evidence, without the need for strict proof of the existence of a wrongful act, imminent harm,

irreparable injury, and the absence of an adequate remedy at law." *King v. Lyons*, 457 S.W.3d 122, 131 (Tex. App.—Houston [1st Dist.] 2014, no pet.); *accord S.V.*, 2017 WL 3725981, at \*8. Additionally, Texas Rule of Civil Procedure 67 provides in part, "When issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings." TEX. R. CIV. P. 67. "The trial court has broad discretion in determining whether an unpleaded issue was tried by consent." *Case Corp. v. Hi-Class Bus. Sys. of Am., Inc.*, 184 S.W.3d 760, 771 (Tex. App.—Dallas 2005, pet. denied).

## B. Application of Law to Facts

In his third issue, Father argues the trial court abused its discretion by ordering permanent injunctions against him "sending any written or electronic correspondence to any school that the child currently attends, or any schools the child attends in the future, or the residence of the paternal grandparent" and "attempting to contact the child by telephone." According to Father, (1) "[n]o petitions on file pray for injunctions"; (2) petitioners "did not ask for a trial amendment to add a request for a permanent injunction"; (3) there was no evidence and no "trial by consent" as to Father contacting the school of C.E.C., sending correspondence to Grandmother's residence, or attempting to make phone calls to C.E.C.; and (4) "the injunctions issued by the [trial] court are more comprehensive and restrictive than justified by the evidence and the usages of equity."

However, the record shows (1) Father testified he was requesting "future contact" with C.E.C. and recently attempted to contact her; (2) Grandmother testified Father has attempted to contact her to "provide emotional support" to C.E.C., "[t]here's no reason" to allow Father "access to" C.E.C., and she is concerned Father will try to harm C.E.C. mentally and physically if he has such access; (3) counsel for Father stated during closing that even in the event termination was granted, Father was requesting that the trial court "allow at least some type of phone contact if the child desires to have it" and "supervised access at all times, cards, pictures, and letters"; that

–16–

petitioner "set up some type of personal e-mail account for the child and allow the child to respond with her father on a regular basis"; and that "if allowed by his probation officer to attend school activities, [sic] if the child wishes to visit"; and (4) C.E.C.'s amicus attorney stated during closing "it is not in the child's best interest to have any access to [Father], who is currently incarcerated because of child pornography" and "there is no situation in which the child needs access or even communication with [Father]." On this record, we conclude the trial court did not abuse its discretion respecting the injunctive relief in question. *See King*, 457 S.W.3d at 131; *see also S.V.*, 2017 WL 3725981, at \*8.

We decide Father's third issue against him.

## V. CONCLUSION

We decide against Father on his three issues. The trial court's judgment is affirmed.

/Douglas S. Lang/
DOUGLAS S. LANG
JUSTICE

171482F.P05



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

IN THE INTEREST OF C.E.C., A MINOR
CHILD

No. 05-17-01482-CV

On Appeal from the 255th Judicial District
Court, Dallas County, Texas
Trial Court Cause No. DF-08-10464.
Opinion delivered by Justice Lang, Justices
Brown and Whitehill participating.

In accordance with this Court's opinion of this date, the judgment of the trial court is
**AFFIRMED**.

Judgment entered this 21st day of June, 2018.