**AFFIRMED; Opinion Filed December 3, 2018.**



**In The**

# Court of Appeals
# Fifth District of Texas at Dallas

### No. 05-18-00793-CV

### IN THE INTEREST OF D.D., JR., A CHILD

**On Appeal from the 255th Judicial District Court**
**Dallas County, Texas**
**Trial Court Cause No. DF-17-10679**

### No. 05-18-01329-CV

### IN THE INTEREST OF R.P., A CHILD

**On Appeal from the 255th Judicial District Court**
**Dallas County, Texas**
**Trial Court Cause No. DF-15-22359**

## MEMORANDUM OPINION

Before Justices Lang, Myers, and Stoddart
Opinion by Justice Lang

Appellant ("Mother") challenges two trial court judgments terminating her parental rights

to her children D.D., Jr. and R.P., respectively ("the children"). Following a consolidated bench

trial, the trial court found (1) Mother committed three statutory acts supporting termination and

(2) termination of Mother's parental rights was in the children's best interest. The trial court signed

separate judgments in each case terminating Mother's parental rights and appointing the Texas

Department of Family and Protective Services ("the Department" or "CPS") as the permanent managing conservator of each child.[1]

In two issues on appeal,[2] Mother contends the evidence is legally and factually insufficient to support (1) a finding that termination of her parental rights is in the best interest of the children and (2) the appointment of the Department as managing conservator of the children.

We decide Mother's two issues against her. The trial court's judgments are affirmed.

## I. FACTUAL AND PROCEDURAL CONTEXT

D.D., Jr. and R.P. were born in 2012 and 2015, respectively. On May 25, 2017, the Department filed separate original petitions respecting each child "for protection of a child, for conservatorship, and for termination in a suit affecting the parent-child relationship" pursuant to Chapter 262 of the Texas Family Code. *See* TEX. FAM. CODE ANN. §§ 262.001–.352. Therein, the Department requested permission to take immediate possession of the children and terminate Mother's parental rights.[3] Also, on that same date, the trial court signed orders for "emergency care and temporary custody" respecting each child and named the Department as the children's temporary managing conservator. Mother filed a general denial answer pertaining to both cases.

The consolidated bench trial described above was held on May 9, 2018. Debbie Soule, a Department investigator, testified at trial that in May 2017, the Department received two referrals alleging sexual abuse of D.D., Jr. by his paternal grandparents and drug use and neglectful supervision of the children by Mother. Soule stated she conducted an investigation of those allegations before the petitions described above were filed. Her investigation included (1) speaking

---

[1] The record shows the father of D.D., Jr. is deceased and the father of R.P. voluntarily relinquished his parental rights prior to the trial court's challenged judgments.

[2] Mother's appellate briefs in the two cases described above are identical and assert issues and arguments pertaining to both children collectively. We treat the two cases as companion cases for purposes of this opinion.

[3] Each petition stated in part that "termination of the parent-child relationship is in the child's best interest" and "[Mother] has . . . failed to comply with the provisions of a court order that specifically established the actions necessary for the mother to obtain the return of the child who has been in the permanent or temporary managing conservatorship of [the Department] for not less than nine months as a result of the child's removal from the parent under Chapter 262 for the abuse or neglect of the child, pursuant to § 161.001(b)(l)(O), Texas Family Code."

to members of D.D., Jr.'s family, including a cousin, an aunt, and a grandmother, and (2) visiting D.D., Jr.'s school to speak with him. According to Soule, D.D., Jr. "didn't really want to talk" and "kind of shut down as we talked." Soule testified that when she tried to meet with Mother, Mother initially "gave me a false address" and on another occasion "told me she would meet me and did not." Also, Soule stated that when she spoke with Mother about her drug use, Mother "admitted to smoking marijuana initially" and "then she also—when I requested her taking a drug test, admitt[ed] to something more, but she did not state what it was." Mother underwent a drug test and the results were "positive" for marijuana and methamphetamine. Additionally, Soule testified Mother "display[ed] behavioral mannerisms of someone under the influence," including "ticks," "sniffing," "nervous behavior," and a "haggard appearance."

Guadalupe Sible testified she is the CPS caseworker assigned to the children's cases. She stated that in June 2017, Mother was ordered by the trial court to complete "services" that included "parenting classes, counseling, [and] drug and alcohol abuse assessment and treatment."[4] However, according to Sible, Mother "did not complete any services." Further, Sible testified (1) "[t]hroughout the case, I probably asked [Mother] to go take maybe eight drug tests"; (2) Mother did not take any drug tests; (3) "[Mother] won't specifically tell me that she's using, but she alludes to it by saying, you know why I can't go take the drug test"; (4) Mother exhibited behaviors that gave Sible concern Mother was "under the influence," including being sleepy and agitated; and (5) although Mother visited the children regularly, she exhibited negative behavior at those visits by "continuously ma[king] [D.D., Jr.] feel like he . . . could not have positive thoughts about [his foster parents]" or "feel attached" to them.

---

[4] The appellate record contains a June 19, 2017 trial court order that bears the case numbers of both trial court cases described above and lists the services to be completed by Mother. During trial, the trial court took judicial notice of "the contents of the court's file, including temporary orders and orders made by the [trial court] in this case."

According to Sible, her efforts to make services available for Mother included speaking and texting with Mother on numerous occasions and setting up the paperwork and payments with the service providers. Further, Sible testified in part,

> Q. Did Mother ever in her not doing any services say that she was having difficulty in trying to get to these service providers, or that they weren't—these service providers maybe letting them—letting her go to do these services?
>
> A. There was one time that she did call me and state that there was—that they didn't have the paperwork, but I called and confirmed that they had it, and they did have it.

Additionally, Sible stated (1) prior to being removed from Mother, D.D., Jr. was "very shut down," "wouldn't speak to anybody," and "was not doing well in school," and R.P. was not potty-trained or talking; (2) in the children's current placement, D.D., Jr. is being treated by a psychiatrist, has shown "very positive" changes in his behavior, and is doing well in school, and R.P. is completely potty-trained and "has no issues"; (3) both children have "bonded well with the foster parents"; (4) there is potential for the children to be adopted by a foster family and there have been "indications" that the current placement could become a permanent placement; (5) Mother has stated she is homeless and has not indicated that she has employment; and (6) Sible believes termination of Mother's parental rights is in the best interest of the children.

Mother was present at the consolidated trial through counsel and by phone. Mother testified (1) the sexual abuse allegations described above are not true; (2) immediately prior to the removal of the children, she and the children lived "between motel to motel" and she gave the Department those addresses; (3) she made herself available to the Department "most of the time," "except in the beginning because I was scared"; (4) she never placed the children in an environment or conditions that would endanger them in any way; (5) she has been diagnosed with "anemia," which has caused her to feel "weakness" on occasion; (6) she does not have "a current drug problem or addiction issue," but is "willing" to go to drug treatment "just so you-all can see that I don't have

–4–

a problem"; (7) she has never exhibited any negative behavior during her visits with the children, but "would just correct" D.D., Jr. when he referred to his foster parents as mom and dad; (8) she loves the children; (9) the children love her and "want me there" during visits; and (10) she does not believe termination of her parental rights is in the best interest of the children. Additionally, Mother stated in part,

Q. Okay. And the services that were ordered, you remember all of those services, correct?

A. No, not all of them. Some of them.

Q. Okay. And could you describe to the Court what the status is of those services and where you left off?

A. Well, at the beginning I had went to Metro Care, but they needed the paperwork. And when I asked [Sible], she was always giving me the runaround and never sent it.

Q. Okay.

A. She did send it to Nexus, which she had asked me to go there, but at that time I was in a relationship with somebody that was not trying to let me go.
. . . .
Q. . . . [Y]ou indicated that you have smoked marijuana. Have you used any other illegal substances?

A. Yes.

Q. Okay. And during the pendency of this case, have you?

A. Yes.

Q. Okay. But were you getting treatment for that?

A. No. I had stopped already a while back, but last time I went to court the last time with you-all, you know, it was just a lot for me. I had smoked that one day, and I haven't touched nothing since.

On cross-examination, Mother testified she is currently in jail as the result of an April 29, 2018 arrest on a "felony charge" of drug possession. According to Mother, "it was not mine" and she "doubts" there "will be any long-term repercussions for this arrest." However, she does not

know when she will be released from jail. Further, Mother testified on cross-examination as follows:

> Q. . . . [D]o you remember at the start of this case, do you remember CPS telling you your drug test results being positive for . . . methamphetamine, and marijuana?
> . . . .
> A. Yes.
>
> Q. And since that time, since your positive drug results, you have not taken any other drug test with CPS; is that correct?
>
> A. Yes, sir.
>
> Q. And CPS has asked you a number of times—
>
> A. Four times.
> . . . .
> Q. Now, is it fair to say that if the judge told you in person June of last year to go to drug treatment, to go take drug tests, and in this entire year you have not done any of that, do you still think that it is reasonable to ask for your children to be returned to you?
>
> A. Yes. I had a little small hick up [sic]. Okay. You can't punish me forever for it. I've never been a bad mother to my kids.
>
> Q. And . . . regarding your other services, your psychological evaluation, individual counseling, you did not complete those services, have you?
>
> A. [Sible] would not send the papers. She always told me, it is too late. It is too late. It is too late. This was before even last November. How is it too late?
>
> Q. And . . . that's a no, is that correct, that you did not do those services?
>
> A. Yes.
> . . . .
> Q. . . . Are you aware your family members are concerned for your wellbeing?
>
> A. It was just—they were concerned about the man I was with.
>
> Q. And the man you were with was violent, wasn't he?
>
> A. Not the current boyfriend I had. No, the man before that, yes.
>
> Q. And he was doing drugs, wasn't he?
>
> A. Yes.

Q. And the current boyfriend that—this last one you mentioned, he's the one that you relapsed with; is that correct?

A. Yes. And I even told [Sible], if you-all want me to stay away, I will stay away. She told me no, that's not what we're asking you.

Q. . . . [G]iven everything that you just testified to, that you haven't completed drug tests, that you haven't gone through treatment, given all the relationships, the fact that you're currently in jail, you still think it is reasonable for your children to be returned to you today?

A. Well, as of right now, well I'm in here, obviously not, but I'm just asking to get a little more time.
. . . .
Q. Okay. Now, you indicated that you relapsed because you were stressed out; is that correct?

A. Not stressed out, just hurt over all this.

Q. Okay. Ma'am, when was the last time you used drugs?

A. The last time when we went and had court last month or so, but prior to that, I hadn't used in almost a week before that.

Additionally, Mother stated on cross-examination (1) she had her "own place" until shortly before the children were removed, but "my husband at the time he had took all my money and ran off, which was my rent money"; (2) she and the children then stayed with her brother and his wife and five children for about a week, but left there when the utilities were cut off; (3) at the time of her current arrest, she was living in her car; (4) when she is released from jail, she plans to stay with her brother and his family or "go to Nexus where I can have my kids there with me until I can find my own place"; (5) she has two additional, older children, one who was "removed" from her and one who chose to live permanently with her grandmother; and (6) she is currently in a relationship with a man who has a felony conviction and is incarcerated, but she has "decided to let [him] go."

During closing argument, the Department asserted in part,

It is clear that [Mother's] still struggling with drug use. From the time that this case has started, she was positive for methamphetamine. She even admitted to that, and

she knows that she has relapsed throughout the case. Also, the concerns of the child's emotional wellbeing. Being in therapy, seeing his change from bad to now being in therapy and how that's really affecting him positively. It is clear these children have been in surroundings which endanger their physical or emotional wellbeing, and clearly Mother did not complete her services.

The trial court stated it "finds by clear and convincing evidence that the parental rights of [Mother] shall be terminated based on 161 D, E, O, and best interest grounds." Further, the trial court signed separate judgments in each case that each stated in part that the trial court finds (1) Mother "has failed to comply with the provisions of a court order that specifically established the actions necessary for the mother to obtain the return of the child that have been in the permanent or temporary managing conservatorship of the Texas Department of Family and Protective Services for not less than nine months as a result of the child's removal from the parent under Chapter 262 for the abuse or neglect of the child, pursuant to section 161.001(1)(O) of the Texas Family Code" and (2) "termination of the parent–child relationship between [Mother] and the subject child is in the best interest of the child." Appeals in each case timely followed.

## II. TERMINATION OF MOTHER'S PARENTAL RIGHTS

### A. Standard of Review

Because termination of parental rights is complete, final, and irrevocable, the evidence in support of termination must be clear and convincing before a court may involuntarily terminate a parent's rights. *In re N.T.*, 474 S.W.3d 465, 474–75 (Tex. App.—Dallas 2015, no pet.); *see also In re A.B.*, 437 S.W.3d 498, 502–03 (Tex. 2014); *In re J.D.B.*, 435 S.W.3d 452, 462 (Tex. App.—Dallas 2014, no pet.). "Clear and convincing evidence" is "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." *N.T.*, 474 S.W.3d at 475 (quoting FAM. § 101.007).

On appeal, we apply a standard of review that reflects the elevated burden at trial. *Id*. This means both legal and factual sufficiency review of a decree terminating parental rights require a

reviewing court to consider all the evidence to determine whether the fact-finder could reasonably form a firm belief or conviction that the grounds for termination are proven. *J.D.B.*, 435 S.W.3d at 462 (citing *In re J.F.C.*, 96 S.W.3d 256, 265–66 (Tex. 2002)). Further, under both the legal and factual sufficiency standards, the appellate court must defer to the fact-finder's determinations as to witness credibility. *N.T.*, 474 S.W.3d at 475.

In evaluating the evidence for legal sufficiency in a termination case, we view the evidence in the light most favorable to the finding. *J.D.B.*, 435 S.W.3d at 462; *In re T.A.D.*, 397 S.W.3d 835, 839 (Tex. App.—Dallas 2013, no pet.). We "consider all the evidence, not just that which favors the verdict," and we assume the fact-finder resolved disputed facts in favor of its finding if a reasonable fact-finder could do so. *J.D.B.*, 435 S.W.3d at 462–63 (citing *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005)). We disregard all evidence that a reasonable fact-finder could have disbelieved or found to have been incredible. *Id.* at 463; *see In re K.M.L.*, 443 S.W.3d 101, 116 (Tex. 2014).

When reviewing the factual sufficiency of the evidence supporting a termination finding, an appellate court asks whether, in light of the entire record, the evidence is such that a fact-finder could reasonably form a firm conviction about the truth of the allegations. *N.T.*, 474 S.W.3d at 475. We must give due consideration to evidence that the fact-finder could reasonably have found to be clear and convincing. *A.B.*, 437 S.W.3d at 503. "If, in light of the entire record, the disputed evidence that a reasonable fact-finder could not have credited in favor of the finding is so significant that a fact-finder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient." *Id.* (quoting *J.F.C.*, 96 S.W.3d at 266).

### B. Applicable Law

The trial court may terminate the parent–child relationship if the fact-finder finds by clear and convincing evidence that the parent committed one or more of the acts and omissions

–9–

enumerated in family code section 161.001(b)(1) and termination is in the child's best interest. FAM. § 161.001(b)(1)–(2). The acts and omissions in section 161.001(b)(1) include that "the parent has . . . failed to comply with the provisions of a court order that specifically established the actions necessary for the parent to obtain the return of the child who has been in the permanent or temporary managing conservatorship of [the Department] for not less than nine months as a result of the child's removal from the parent under Chapter 262 for the abuse or neglect of the child." *Id*. § 161.001(b)(1)(O).

A judicial determination of the "best interest" of a child "is not dependent upon, or equivalent to, a finding that the child has been harmed by abuse or neglect or is in danger of such harm." *In re M.J.P.*, No. 05-16-01293-CV, 2017 WL 655955, at *6 (Tex. App.—Dallas Feb. 17, 2017, no pet.) (mem. op.). Rather, "best interest" is "a term of art encompassing a much broader, facts-and-circumstances based evaluation that is accorded significant discretion." *Id*. (quoting *In re Lee*, 411 S.W.3d 445, 460 (Tex. 2013) (orig. proceeding)); *see also In re C.R.*, 263 S.W.3d 368, 375 (Tex. App.—Dallas 2008, no pet.) ("[P]arental rights may not be terminated merely because a child might be better off living elsewhere."). In reviewing a fact-finder's best interest finding, we consider several nonexclusive factors, including (1) the child's desires, (2) the child's current and future emotional and physical needs, (3) current and future emotional and physical dangers to the child, (4) the parental abilities of those seeking custody, (5) the programs available to help those individuals promote the child's best interest, (6) those individuals' plans for the child, (7) the home's or proposed placement's stability, (8) the parent's acts or omissions indicating that the existing parent–child relationship is not a proper one, and (9) any excuse for the parent's acts or omissions. *M.J.P.*, 2017 WL 655955, at *6 (citing *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976)). An absence of evidence of some *Holley* factors does not preclude a finding that termination is in the child's best interest, particularly if undisputed evidence shows that the parental

relationship endangered the child's safety. *In re A.R.M.*, No. 05-17-00539-CV, 2018 WL 1559820, at \*2 (Tex. App.—Dallas Mar. 30, 2018, pet. denied) (mem. op.) (citing *N.T.*, 474 S.W.3d at 477). Further, the same evidence can be relevant to both section 161.001(b)(1) termination grounds and the child's best interest. *In re D.W.*, 445 S.W.3d 913, 925 (Tex. App.—Dallas 2014, pet. denied).

### C. Application of Law to Facts

In her first issue, Mother contends the evidence is "legally and factually insufficient to prove that termination of [her] parental rights is in the best interest of the children." According to Mother, "the parent–child relationship is appropriate, and there are excuses for her omissions and acts." Specifically, Mother asserts (1) she "was unable to complete her services because the Department failed to provide the appropriate paperwork"; (2) she "picked up a criminal charge that she testified at trial is a false charge against her" and thus "had a valid excuse for not completing her services"; (3) "[h]er boyfriend would not allow her to go to drug treatment"; (4) there is no evidence that she was aware of any abuse occurring to D.D., Jr.; (5) she "lacks stability in her home due to reasons outside her control," i.e., "her husband stole her rent money and ran off"; and (6) "there is no evidence that the current foster family placement of the children intends to adopt the children."

The Department responds that the evidence is legally and factually sufficient to support the trial court's finding that terminating the parent–child relationships is in the best interests of the children. Specifically, the Department asserts (1) "[b]oth children are well cared for in foster care, and there is the potential for permanent placement of the children with their current foster parents"; (2) Mother "has a history of continuing drug abuse" and "was incarcerated for a drug arrest at the time of the termination hearing"; and (3) Mother "has demonstrated a lack of ability to provide for the permanence necessary to the physical and emotional well-being of the children."

As described above, the first *Holley* factor looks at the children's desires. *See Holley*, 544 S.W.2d at 371–72. Both children are very young and neither testified at trial. Although Mother testified the children love her and want to be with her during visits, evidence that a child loves a parent and enjoys visits is only marginally relevant to a best interest finding. *D.W.*, 445 S.W.3d at 926. Based on the record before us, we conclude this factor is neutral, weighing neither in favor of nor against termination of Mother's parental rights. *See id.* (concluding first *Holley* factor was neutral where record did not indicate that children aged nine, eight, six, and five "were sufficiently mature to express a preference as to their placement"); *In re A.C.*, 394 S.W.3d 633, 643 (Tex. App.—Houston [1st Dist.] 2012, no pet.) (generally "[t]he young age of [a] child render[s] consideration of the child's desires neutral").

Next, we consider together the second, third, fourth, and eighth *Holley* factors. *See In re B.K.*, No. 06-18-00037-CV, 2018 WL 3892860, at *4 (Tex. App.—Texarkana Aug. 16, 2018, pet. denied) (mem. op.) (considering second, third, fourth, and eighth factors together). Those factors are the children's current and future physical and emotional needs, the current and future emotional and physical dangers to the children, the parental abilities of the person seeking custody, and the parent's acts or omissions indicating that the existing parent–child relationship is not a proper one. *See id.* The record shows (1) at the time of trial, Mother was in jail on drug charges and did not know when she would be released, and (2) Mother testified she is homeless, has continued to use illegal drugs after the children were removed from her, has repeatedly refused to take drug tests requested by the Department during this case, and believes she does not "have a problem" with drugs. Additionally, the record contains no indication Mother is employed. "A parent who lacks stability, income, and a home is unable to provide for a child's emotional and physical needs." *In re J.T.G.*, No. 14-10-00972-CV, 2012 WL 171012, at *17 (Tex. App.—Houston [14th Dist.] Jan. 19, 2012, pet. denied) (mem. op.). Also, Mother's drug use "posed a very real danger" to the

children. *In re O.R.F.*, 417 S.W.3d 24, 40 (Tex. App.—Texarkana 2013, pet. denied). Further, those same acts and omissions indicate that the existing parent–child relationship is not a proper one. *Id.* On this record, we conclude the second, third, fourth, and eighth *Holley* factors weigh in favor of termination of Mother's parental rights. *See B.K.*, 2018 WL 3892860, at *4.

The remaining *Holley* factors are the programs available to help the persons seeking custody to promote the children's best interest, those individuals' plans for the children, the stability of the home or proposed placement, and any excuse for the parent's acts or omissions. *See Holley*, 544 S.W.2d at 371–72. As described above, Mother's excuses for not completing her services include (1) "the Department failed to provide the appropriate paperwork"; (2) she "picked up a criminal charge that she testified at trial is a false charge against her"; (3) "[h]er boyfriend would not allow her to go to drug treatment"; and (4) she "lacks stability in her home due to reasons outside her control," i.e., "her husband stole her rent money and ran off." However, the record shows (1) Sible testified that on the "one time" Mother called her and told her the service provider "didn't have the paperwork," Sible "called and confirmed that they had it, and they did have it"; (2) Mother's "false charge" did not occur until her April 29, 2018 arrest, which was approximately ten months after she was ordered to complete services; and (3) the Department made drug treatment and other services available to Mother, but she did not take advantage of those services. Under both the legal and factual sufficiency standards, the appellate court must defer to the fact-finder's determinations as to witness credibility. *N.T.*, 474 S.W.3d at 475.

Also, Mother contends "there is no evidence that the current foster family placement of the children intends to adopt the children." However, the record shows Sible testified there is potential for the children to be adopted by a foster family and there have been "indications" that the current placement could become a permanent placement. *See D.W.*, 445 S.W.3d at 930 n.5 (Department's inability to identify definite permanent placements for children is not dispositive in determining

–13–

best interest of children). Additionally, Mother testified her plans are that, upon her release from jail, she and the children will "go to Nexus where I can have my kids there with me until I can find my own place" or stay with her brother and his family, whose home they left on a prior occasion when the utilities were turned off. Sible stated that in the children's current placement, (1) D.D., Jr. is being treated by a psychiatrist, has shown "very positive" changes in his behavior, and is doing well in school; (2) R.P. is completely potty-trained and "has no issues"; and (3) both children have "bonded well with the foster parents." On this record, we conclude the fifth, sixth, seventh, and ninth *Holley* factors weigh in favor of termination of Mother's parental rights. *See D.W.*, 445 S.W.3d at 929–31 (fifth, sixth, seventh, and ninth *Holley* factors weighed in favor of termination where foster family, although not committed to adoption, provided stable environment, Mother lacked stable housing, and evidence controverted Mother's excuses for not completing services); *B.K.*, 2018 WL 3892860, at *5 (fifth, sixth, seventh, and ninth *Holley* factors weighed in favor of termination where Mother did not take advantage of services offered by Department, had ample time prior to incarceration to complete services, and had no stable housing).

As described above, all of the *Holley* factors except one weigh in favor of terminating Mother's parental rights. *See Holley*, 544 S.W.2d at 371–72. On this record, we conclude the evidence is legally and factually sufficient to support the trial court's finding that termination of Mother's parental rights was in the children's best interest. *See J.F.C.*, 96 S.W.3d at 265–66; *see also In re M.R.*, 243 S.W.3d 807, 821 (Tex. App.—Fort Worth 2007, no pet.) ("A parent's drug use, inability to provide a stable home, and failure to comply with a family service plan support a finding that termination is in the best interest of the child.").

We decide against Mother on her first issue.

## III. APPOINTMENT OF MANAGING CONSERVATOR

In a suit affecting the parent–child relationship, the trial court may appoint a managing conservator. *See* FAM. §§ 153.005(a), 161.207(a). A managing conservator must be a parent, a suitable, competent adult, the Department, or a licensed child-placing agency. *Id*. § 153.005(b), 161.207(a). "The best interest of the child shall always be the primary consideration of the court in determining the issues of conservatorship and possession of and access to the child." *Id*. § 153.002.

In her second issue, Mother contends the evidence is insufficient to support the appointment of the Department as the permanent managing conservator of the children. However, termination of the parent–child relationship divests the parent of all legal rights and duties with respect to the child. *Id*. § 161.206(b). Because we have decided against Mother regarding her challenge to the portions of the trial court's judgments terminating her parental rights, those judgments have divested Mother of her legal rights and duties respecting the children. *See In re C.E.C.*, No. 05-17-01482-CV, 2018 WL 3062454, at *8 (Tex. App.—Dallas June 21, 2018, no pet.) (mem. op.) (citing *In re D.K.W., Jr.*, No. 01-17-00622-CV, 2017 WL 6520439, at *5 (Tex. App.—Houston [1st Dist.] Dec. 21, 2017, pet. denied) (mem. op.)). As a result, Mother does not have standing to challenge the portions of the judgments appointing the Department as permanent managing conservator of the children because any alleged error could not injuriously affect her rights. *Id*.

We decide against Mother on her second issue.

## IV. CONCLUSION

We decide Mother's two issues against her. The trial court's judgments are affirmed.

/Douglas S. Lang/
DOUGLAS S. LANG
JUSTICE

180793F.P05



## Court of Appeals
## Fifth District of Texas at Dallas
## JUDGMENT

IN THE INTEREST OF D.D., JR., A CHILD

No. 05-18-00793-CV    V.

On Appeal from the 255th Judicial District Court, Dallas County, Texas
Trial Court Cause No. DF-17-10679.
Opinion delivered by Justice Lang, Justices Myers and Stoddart participating.

In accordance with this Court's opinion of this date, the judgment of the trial court is **AFFIRMED**.

Judgment entered this 3rd day of December, 2018.



## Court of Appeals
## Fifth District of Texas at Dallas
### JUDGMENT

IN THE INTEREST OF R.P., A CHILD

No. 05-18-01329-CV

On Appeal from the 255th Judicial District Court, Dallas County, Texas
Trial Court Cause No. DF-15-22359.
Opinion delivered by Justice Lang, Justices Myers and Stoddart participating.

In accordance with this Court's opinion of this date, the judgment of the trial court is **AFFIRMED**.

Judgment entered this 3ʳᵈ day of December, 2018.