**Affirm and Opinion Filed October 4, 2024**



In The
# Court of Appeals
# Fifth District of Texas at Dallas

### No. 05-24-00456-CV

## IN THE INTEREST OF O.O., A CHILD

**On Appeal from the 15th Judicial District Court**
**Grayson County, Texas**
**Trial Court Cause No. FA-22-0669**

## MEMORANDUM OPINION
Before Justices Molberg, Nowell, and Kennedy
Opinion by Justice Nowell

Father appeals from an order terminating his parental rights with respect to his child, O.O. Following a bench trial, the court found by clear and convincing evidence that Father engaged in conduct prohibited by sections 161.001(b)(1)(D), (E), and (O) of the Texas Family Code, and termination was in O.O.'s best interest. On appeal, Father challenges each of these findings. We affirm.

STANDARD OF REVIEW

Because the fundamental liberty interest of parents in the care, custody, and control of their children is of constitutional dimensions, involuntary parental terminations must be strictly scrutinized. *In re J.S.*, 675 S.W.3d 120, 127 (Tex. App.—Dallas 2023, no pet.) (citing *In re K.M.L.*, 443 S.W.3d 101, 112 (Tex. 2014)).

The Texas Family Code provides that a court may order termination of a parent–child relationship if the court finds by clear and convincing evidence that the parent engaged in conduct prohibited by section 161.001(b)(1) and termination is in the child's best interest. *See* TEX. FAM. CODE § 161.001(b)(1), (2). "Clear and convincing evidence" is that "measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." TEX. FAM. CODE § 101.007.

On appeal, we apply a standard of review that reflects the elevated burden at trial. *In re J.S.*, 675 S.W.3d at 127. Under both legal and factual sufficiency standards, we consider all the evidence, defer to the factfinder's credibility determinations, and determine whether the factfinder could reasonably form a firm belief or conviction that the grounds for termination were proven. *Id.* "The distinction between legal and factual sufficiency lies in the extent to which disputed evidence contrary to a finding may be considered." *Id*.

When conducting a legal sufficiency review of an order terminating parental rights, we consider all the evidence, not just that which favors the verdict, and we assume the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could do so. *Id.* at 128. We disregard all evidence that a reasonable factfinder could have disbelieved or found to have been incredible. *Id.*

When reviewing the factual sufficiency of the evidence supporting a termination finding, we ask whether, in light of the entire record, the evidence is

such that a factfinder could reasonably form a firm conviction about the truth of the allegations against the parent. *Id.* We must consider whether the disputed evidence is such that a reasonable factfinder could not have reconciled that disputed evidence in favor of its finding. *Id.* If the disputed evidence is so significant that a factfinder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient. *Id.*

When, as in this case, a trial court terminates a parent's rights based on section 161.001(b)(1)(D) or (E) and the parent challenges that finding on appeal, due process requires the appellate court to review the findings and detail its analysis. *Id.*

FACTUAL BACKGROUND

The trial court made extensive findings of fact that Father does not challenge on appeal.

A.     Mother's and Father's History

Father and Mother[1] met in 2018 and were in a romantic relationship when O.O. was born in 2022. Both parents were more than 30 years old at the time of trial.

Mother began using methamphetamine when she was 18 years old and has continued doing so as an adult. When Mother was in her late 20s, she was diagnosed with schizoaffective and bipolar disorders.[2] Mother has taken prescribed medication

---

[1] Mother executed an Affidavit of Voluntary Relinquishment of Parental Rights to the Department of Family and Protective Services, and she is not a party to this appeal.

[2] Mother's mental health conditions have been described as schizoaffective disorder, bipolar disorder, schizophrenia, and ADHD.

to treat these disorders sporadically; she prefers not to take them because they make her feel lost and unable to function well. Father encourages and reminds her to take her prescribed medications, but Mother usually does not.

Mother moved in with Father in August 2019. Father provided conflicting testimony about when he learned about Mother's mental health issues, but all evidence shows he knew about them before O.O. was conceived. Father testified that, after Mother moved in with him, he "just started to notice something weird, strange in her way of thinking. . . She would say things that didn't make sense." Father eventually realized that Mother heard voices and hallucinated.

Mother became pregnant with her first child, Jane,[3] in 2019. Father testified that Mother did not want to have a baby. Mother told multiple people she believed the baby was a snake that would kill her. Mother was hospitalized for mental health treatment in January 2020 during her pregnancy with Jane; the medical records show she told doctors that, when she was released, she planned to kill the baby before it killed her. Other medical records show that after Jane's birth, Mother told doctors she still believed Jane was going to kill her.

While pregnant with Jane, Mother was arrested for possession of methamphetamine and used methamphetamine. Mother and Father fought about her drug use while she was pregnant.

---

[3] Jane is not the child's real name, and Jane is not subject to this termination proceeding.

The Department of Family and Protective Services received a referral in May 2020 after Jane's birth. Donna Lewis, the Department's investigator who worked on Jane's case, testified Father told her that he felt controlled by Mother, and he knew Mother used methamphetamine. He did not voice concerns about Mother's mental health, although he did acknowledge Mother hallucinated. Even so, Father planned to take Mother and Jane home and let Mother care for Jane when he went to work. Lewis did not think Father took Mother's mental health issues seriously, and she did not think he could ensure Jane's safety. Accordingly, the Department removed Jane based on concerns that Mother was unstable and incapable of caring for her and for Jane's immediate safety. When Jane was approximately 6 months old, it was determined that Father was not Jane's biological father; Mother later voluntarily relinquished her parental rights to Jane.

**B.      O.O**.

Mother intentionally became pregnant with O.O. in August 2021 because Father wanted a baby. Father testified he knew Mother had mental health conditions, her pregnancy with Jane had been difficult for her mental health, and she did not want a baby. When asked why he thought it was a good idea to have a baby with Mother in light of these facts, Father responded: "Point one, like I said the previous time I wanted to have a baby. Second, I thought she could change." He testified that Mother had "already changed a little bit" and he could see that "she was already thinking different" when O.O. was conceived.

While pregnant, Mother refused to seek mental health care. Father testified that, while pregnant with O.O., Mother's behavior was not as serious as it had been when she was pregnant with Jane. "I hardly saw strange things. I was just worried about what you know had happened before but I didn't see strange things." However, during her second pregnancy, Mother told her probation officers that she had a snake inside of her that was trying to kill her.

The Department received a referral on May 8, 2022, the day O.O. was born, with concerns that Mother could not care for the newborn. A Department investigator, Nicholas Burns, visited Mother and Father in the hospital. He found Mother "very incoherent and she had difficulty I believe, comprehending the majority of the questions I was asking. . . . She reported to me that she was a movie director for films." Father told Burns that "he did feel [Mother's] mental health concerns affected her ability to parent." Mother received in-patient mental health treatment for approximately one week after giving birth to O.O.

According to a temporary safety plan developed with the Department, Father was permitted leave the hospital with O.O. The safety plan called for O.O. to stay with a family friend, Alicia Salazar, and it specified that Mother could not have unsupervised contact with O.O. However, after Mother returned home from in-patient treatment, Mother was left alone with O.O.

At a June 2, 2022 family team meeting, Burns confronted Mother about her having been left unattended with O.O., and Mother did not deny she had been left

alone with the child. Mother testified she did not believe she needed to be supervised around O.O. Burns believed O.O. being left alone with Mother could create a dangerous situation given Mother's postpartum mental state. Because the safety plan was violated, the Department remained concerned about Mother's mental health. The parents could not provide contact information for other friends or family to care for the infant, so the Department removed O.O.

Elizabeth Holtzlaw, a Department investigator, participated in the creation of the initial family service plan. Both parents signed the document, and it was filed with the court on July 22, 2022, a few weeks after O.O. came into the Department's care. The family plan stated the Department was concerned that Mother "continues to put herself in [a] state of unstable mental health that is not appropriate for caring for a child," and she "demonstrates neglectful tendencies that will cause harm to her daughter." The plan also stated that Father "is unable to identify when [Mother's] mental health is declining." The Department's goals were for Mother to maintain mental stability and for Father to "recognize when [Mother] is mentally unstable." Although the plan indicated that Father "doesn't agree [Mother] has mental health concerns that could warrant a concern of his protective capacity," the hope was that he "will demonstrate he is able to identify mental health issues and concerns and display his understanding of how mental health can be a danger and threat to his daughter and wellbeing of his family." The plan identified that Father "doesn't feel

[Mother] needs to be on medication again . . . but reported counseling would be beneficial for [Mother] in his opinion."

O.O. was placed in foster care when she was 3 weeks old, and O.O. continued living with her foster mother, Alicia Keith, when trial began in November 2023. Keith testified she was concerned about Mother being around O.O. because "her delusions are very real and unfortunately I believe that sometimes it's hard for her to differentiate what is happening around her even when she thought her previous baby was a snake. I think that she could be very dangerous." Keith did not think Father was protective because "he follows the orders of [Mother]." Keith testified she was concerned that O.O. would be in "great danger" if returned to Father.

Father testified he was never concerned that Mother would harm Jane or O.O. But he also admitted "it did cross my mind" that she might take steps to hurt Jane because she had not wanted to be pregnant and believed Jane to be a snake.

### C. Mother's and Father's Current Living Arrangements

Father testified he and Mother were no longer in a relationship at the time of trial. He moved out of the apartment they shared a few months earlier, and he did not intend to rekindle their relationship. Mother testified that Father's lawyer advised him to leave Mother if he wanted to avoid termination of his parental rights, and they lived in separate residences as part of their effort to regain custody of O.O. She explained Father told her that living separately was "just for a short time" so Father could "get the baby and then hopefully become a family again." Even during the

time they lived apart, evidence showed that Mother spent several nights in Father's new apartment, sharing his bed. Mother believed that, if Father regained custody, then he would allow Mother to be an integral part of O.O.'s life.

Father testified he understood that O.O. being with Mother is not in O.O.'s best interest. Father wanted Mother to participate in O.O.'s life, and he planned to allow Mother to have weekly supervised visits with O.O. He did not intend to leave O.O. alone with Mother. Although Father testified he did not believe Mother was a threat to O.O., he also testified he feared Mother could be a danger to O.O., which was "why I could never leave her by herself with her." He believed he could protect O.O. against Mother and also believed he had shown he could provide a safe, stable home for O.O.

At the time of trial, Father worked three jobs and worked long hours every day. Father testified that if O.O. were returned to him, he would need a babysitter or daycare. He named two friends who could babysit O.O. while he worked, but he did not know how much he would need to pay them. He testified he had been working to save money to pay for childcare, and he had saved about $3,000. He also testified that if he regained custody of O.O., he would stop working both days on the weekends and hoped he could work only two jobs. Father had not calculated whether he could earn enough money to care for O.O. if he worked two instead of three jobs.

ANALYSIS

**D.    Sufficiency of Evidence Supporting Subsection (D) and (E)**

Under section 161.001(b)(1)(D), parental rights may be terminated if clear and convincing evidence supports a finding that the parent "knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endanger the physical or emotional well-being of the child." *Id.* § 161.001(b)(1)(D). The relevant time frame for evaluating subsection (D) is before the child's removal because "conditions or surroundings cannot endanger a child unless that child is exposed to them." *In re Baby Girl H.*, No. 05-23-00487-CV, 2023 WL 7485748, at *8 (Tex. App.—Dallas Nov. 13, 2023, no pet.) (mem. op.) (quoting *In re J.W.*, 645 S.W.3d 726, 749 (Tex. 2022)). The Texas Supreme Court has acknowledged that "typically, a parent whose child has been removed and who has only supervised visitation has no control over the child's environment, and the parent's conduct during that time will thus be unrelated to Subsection (D)." *In re J.W.*, 645 S.W.3d at 749 n.12. Moreover, "evidence that a parent will knowingly expose the child to a dangerous environment in the future, while relevant to a best-interest determination, is not proof that the parent has knowingly exposed the child to a dangerous environment in the past for [s]ubsection (D) purposes." *Id.* at 749.

Section 161.001(b)(1)(E) permits termination of parental rights if clear and convincing evidence supports a finding that the parent "engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers

the physical or emotional well-being of the child." Tᴇx. Fᴀᴍ. Cᴏᴅᴇ § 161.001(b)(1)(E). This provision addresses parental misconduct. *In re J.S.*, 675 S.W.3d at 128.

The relevant inquiry under subsection (E) is whether evidence shows that the endangerment of the child's well-being was the direct result of the parent's conduct, including acts, omissions, or failures to act. *In re K.G.F.*, No. 05-23-01255-CV, 2024 WL 2150029, at *7 (Tex. App.—Dallas May 14, 2024, pet. denied) (mem. op.). Termination under subsection (E) must be based on more than a single act or omission; there must be a voluntary, deliberate, and conscious course of conduct by the parent. *Id.* The offending conduct does not need to be directed at the child, nor must the child suffer an injury. *Id.* (citing *In re J.O.A.*, 283 S.W.3d 336, 345 (Tex. 2009)). But, under subsection (E), endangerment encompasses "more than a threat of metaphysical injury or the possible ill effects of a less-than-ideal family environment." *Id.* When determining whether a parent engaged in a course of "endangering" conduct, a trial court may consider conduct that occurred before and after the child's birth, in the child's presence and outside the child's presence, and before and after removal by the Department. *Id.* (citing *In re J.O.A.*, 283 S.W.3d at 345; *In re K.B.*, No. 05-19-00700-CV, 2019 WL 5485320, at *3 (Tex. App.—Dallas Oct. 25, 2019, no pet.) (mem. op.)).

Subsections (D) and (E) both require proof of endangerment. *In re J.S.H.*, No. 05-24-00159-CV, 2024 WL 2348187, at *3 (Tex. App.—Dallas May 23, 2024, no

pet.) (mem. op.) (citing *In re J.D.B.*, 435 S.W.3d 452, 463 (Tex. App.—Dallas 2014, no pet.)). To "endanger" a child means to expose to loss or injury or to jeopardize the child's emotional or physical health, but it is not necessary that the conduct be directed at the child or that the child actually suffer an injury. *Id.* (citing *In re J.D.B.*, 435 S.W.3d at 463). A parent's conduct that subjects a child to a life of uncertainty and instability endangers the child's physical and emotional well-being. *Id.* A parent's use of illegal drugs—especially after a child's removal—can constitute endangering conduct within the meaning of section 161.001(b)(1)(E). *Id.*; *see also In re J.S.*, 675 S.W.3d at 128 ("Drug use during pregnancy, which Mother engaged in, may amount to conduct that endangers the physical and emotional well-being of the child."). Likewise, a parent's failure to cooperate with the Department and failure to participate in court-ordered services can qualify as endangering conduct. *In re J.S.H.*, 2024 WL 2348187, at *3. While mental illness alone is not a basis for terminating the parent–child relationship, when a parent's mental state allows her to engage in conduct that endangers the child's physical or emotional well-being, that conduct has a bearing on the advisability of terminating the parent's rights. *In re H.S.*, No. 02-23-00367-CV, 2024 WL 1207304, at *19 (Tex. App.—Fort Worth Mar. 21, 2024, pet. abated) (citing *In re L.M.F.*, No. 02-13-00459-CV, 2014 WL 2465137, at *14 (Tex. App.—Fort Worth May 29, 2014, no pet.) (per curiam) (mem. op.)).

A parent's knowledge of the other parent's drug use during pregnancy, and corresponding failure to attempt to protect the unborn child from the effects of that

drug use, can contribute to an endangering environment and support endangerment findings. *See In re J.W.*, 645 S.W.3d at 749-50. To allow otherwise "would effectively endorse a parent's willful ignorance of the significant risk that a pregnant mother's drug use poses," which the supreme court has declined to do. *Id.* at 750.

Because the evidence concerning the (D) and (E) termination grounds is interrelated, courts may consolidate examination of the record. In re *C.V. L.*, 591 S.W.3d 734, 750 (Tex. App.—Dallas 2019, pet. denied).

Father knew Mother has schizoaffective and bipolar disorders. He also knew Mother: refused to take her prescribed medications; used methamphetamine before and during her pregnancy with Jane; thought Jane was a snake who wanted to kill her; was hospitalized for mental health treatment while pregnant with Jane; relinquished her parental rights to Jane; and did not want to have another baby. Despite knowledge of these facts, Father pursued a second pregnancy with Mother. He also refused to acknowledge the risks Mother would pose to a second baby. Instead, Father testified he did not believe Mother would be dangerous to either baby; however, the evidence does not support Father's belief. The evidence shows Mother believed she was again pregnant with a snake that was trying to kill her when she was pregnant with O.O., she continued having hallucinations and was hospitalized for mental health treatment after O.O.'s birth, and she did not think she needed to be supervised when she was with O.O.

In this appeal, Father essentially asks us to ignore these facts, which reflect his failures and inability to protect O.O. from the effects of Mother's mental illness and drug use, and endorse his willful ignorance of the significant risk that Mother's untreated mental health concerns pose to the child. The supreme court has stated that we may not do so. *See In re J.W.*, 645 S.W.3d at 749-50. While Father encouraged Mother to take her medications, his encouragement is insufficient when Mother continually ignored that advice.

Although Father claimed he is no longer in a relationship with Mother and he would only allow Mother to have supervised visits, Father's testimony was disputed. Evidence showed Mother spent nights at Father's apartment, including in his bed. Mother testified they broke up to increase Father's chances of regaining custody of O.O., and they planned to reunite after the trial and raise O.O. as a family. Mother wanted to be an integral part of O.O.'s life, and she believed Father would allow her to be. Neither Mother nor Father considered Mother to be a threat to O.O.

Finally, Father did not attend classes to learn about living with someone with a serious mental illness or individual therapy to learn about unhealthy romantic relationships. A CASA supervisor testified that Father did not make an effort to better understand Mother's mental health during the case even though he was provided with the resources to do so. Father's unwillingness to attend classes and individual therapy is consistent with the Department's assessment that Father "doesn't agree [Mother] has mental health concerns that could warrant a concern of

–14–

his protective capacity" and "doesn't feel [Mother] needs to be on medication again."

Having reviewed the entire record, including the trial court's extensive, unchallenged findings of fact, we conclude the Department carried its burden to prove by clear and convincing evidence that Father "knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endanger the physical or emotional well-being of the child," *see* TEX. FAM. CODE § 161.001(b)(1)(D), and "engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child," *see id*. § 161.001(b)(1)(E).

In light of our resolution that the evidence is legally and factually sufficient under subsections (D) and (E), we need not consider whether it also is sufficient under subsection (O). *See* TEX. R. APP. P. 47.1; *see also In re M.P*., 639 S.W.3d 700, 702 (Tex. 2022) (only one predicate ground and a best interest finding are necessary for termination).

### E.    Best Interest Finding

The supreme court has set forth a list of non-exclusive factors to be considered when determining whether termination is in a child's best interest:

> (1) the child's desires;
> (2) the child's emotional and physical needs now and in the future;
> (3) any emotional and physical danger to the child now and in the future;
> (4) the parental abilities of the individuals seeking custody;

(5) the programs available to assist the individuals seeking custody to promote the best interest of the child;

(6) the plans for the child by the individuals or agency seeking custody;

(7) the stability of the home or proposed placement;

(8) the parent's acts or omissions which may indicate that the existing parent–child relationship is improper; and

(9) any excuse for the parent's acts or omissions.

*In re J.S.*, 675 S.W.3d at 130; *see also Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976). This list is not exclusive, and the State need not prove all of the factors as a condition precedent to termination. *In re J.S.*, 675 S.W.3d at 130. Further, undisputed evidence of just one factor may be sufficient in a particular case to support a finding that termination is in the child's best interest. *In re C.V.L.*, 591 S.W.3d 734, 753 (Tex. App.—Dallas 2019, pet. denied). But the presence of scant evidence relevant to each factor will generally not support such a finding. *Id.*

O.O. was removed shortly after birth because Mother was left unsupervised with her, thus violating the temporary safety plan. At the time of trial, O.O. was less than 2 years old and had lived with the same foster parent throughout the pendency of the case. When, as here, a child is too young to express her desires, the factfinder may consider the child has bonded with the foster family, is well cared for by them, and has spent minimal time with the parent. *In re J.C.N.*, No. 05-21-01163-CV, 2022 WL 1284169, at *8 (Tex. App.—Dallas Apr. 29, 2022, no pet.) (mem. op.) (citing *In re L.G.R.*, 498 S.W.3d 195, 205 (Tex. App.—Houston [14th Dist.] 2016, pet. denied)). A child's need for permanence through the establishment of a stable,

permanent home has been recognized as the paramount consideration in a best-interest determination. *Id.* (citing *In re K.C.*, 219 S.W.3d 924, 931 (Tex. App.—Dallas 2007, no pet.)). Likewise, the stability of the home has been found "to be of paramount importance in a child's emotional and physical well-being." *In re A.H.L.*, No. 01-16-00784-CV, 2017 WL 1149222, at *5 (Tex. App.—Houston [1st Dist.] Mar. 28, 2017, pet. denied) (mem. op.) (quoting *Quiroz v. Dep't of Family & Protective Servs.*, No. 01–08–00548–CV, 2009 WL 961935, at *10 (Tex. App.–Houston [1st Dist.] April 9, 2009, no pet.) (mem. op.)). "Without stability," a parent cannot "provide for the child's emotional and physical needs." *Id.* (quoting *In re C.A.J.*, 122 S.W.3d 888, 894 (Tex. App.–Fort Worth 2003, no pet.)).

O.O. has been cared for by Alicia Keith, her foster mother, since she was removed. Keith testified that O.O. is bonded to her and her family, calls her Mama, and has attended the same daycare since she was 6 months old. Keith testified: "I feel like [O.O.] is bonded with me and my family and her environment. I worry what it would mean to her mentally to move to another place. She is stable and loved and where she is happy. And completely taking her out of that environment that she has been in for so long and that's all she's ever known." Mother testified she believes Keith cares for O.O. well. Mother told Keith that she did not think she could care for O.O. and also said "that she and [Father] weren't able to provide a good life for [O.O.] and [O.O.] had a good life now." Mother told Keith that she attempted to convince Father to voluntarily relinquish his parental rights.

Once per week, Keith facilitates a Zoom call with the parents and O.O. Although the parents only missed one call, they are always approximately five minutes late and often argue about being late. Keith testified the parents have weekly in-person visits with O.O. During the only in-person visit she observed, Keith saw Mother sleeping on the floor while Father played and interacted well with O.O. Father testified he had attended all in-person visits. Keith observed Mother acted aggressively toward Father and would tell him what to do when she became upset.

O.O.'s current and future physical needs are related to any emotional and physical danger to her now and in the future and Father's parental abilities and plans for O.O. In addition to the evidence detailed above, the evidence shows O.O. is a toddler who needs constant care. Father testified he works long hours at three jobs; while he said he would try to work two jobs rather than three if O.O. were returned to him, he did not know whether he could earn enough money by working fewer jobs. Father also had not investigated the cost of childcare for O.O. while he worked. He planned to have two friends who both have part-time jobs care for O.O. when they were able, but he did not know how much, if anything, he would need to pay them.

Father testified he does not have a driver's license, and he planned on driving with O.O. in the car. Likewise, of the two women who Father identified as potential care givers, he believed one had a valid driver's license but conceded he had not checked to ensure she did, and the other woman does not. As to the woman who

does not have a license, Father testified he would be fine with her driving O.O. when O.O. was in her care, and he explained that is because she "is not a problematic person or she would have a bad record."

Finally, the evidence showed that Father lacked sufficient appreciation for the gravity of Mother's mental illness, how Mother's mental illness would affect her interactions with O.O., and that he needed to protect O.O. from Mother. Father had not attended classes to learn about living with someone with a serious mental illness or individual therapy to learn about unhealthy romantic relationships.

Considering all of the evidence related to the *Holley*, factors, we conclude the evidence is legally and factually sufficient to support the trial court's finding that termination of Father's parental rights is in O.O.'s best interest.

CONCLUSION

We affirm the trial court's De Novo Order of Termination signed on April 4, 2024.

/Erin A. Nowell//
ERIN A. NOWELL
240456f.p05                                    JUSTICE



## Court of Appeals
## Fifth District of Texas at Dallas

### JUDGMENT

IN THE INTEREST OF O.O., A CHILD

No. 05-24-00456-CV

On Appeal from the 15th Judicial District Court, Grayson County, Texas
Trial Court Cause No. FA-22-0669.
Opinion delivered by Justice Nowell. Justices Molberg and Kennedy participating.

In accordance with this Court's opinion of this date, the trial court's De Novo Order of Termination signed on April 4, 2024, is **AFFIRMED**.

Judgment entered this 4th day of October, 2024.